[No. B084531. Second Dist., Div. Four. Dec. 28, 1995.]

THIRD STORY MUSIC, INC., Plaintiff and Appellant, v.
TOM WAITS et al., Defendants and Respondents.

COUNSEL

Cohen & Luckenbacher, Evan S. Cohen and S. Martin Keleti for Plaintiff and Appellant.

McCambridge, Deixler, Marmaro & Goldberg, Bert H. Deixler and Daniel L. Germain for Defendants and Respondents.

OPINION

EPSTEIN, Acting P. J.—This case involves a dispute between a company which owned the rights to the musical output of singer/songwriter Tom

Waits from 1972 to 1983 and the party which purchased those rights. The issue is whether a promise to market music, or to refrain from doing so, at the election of the promisor is subject to the implied covenant of good faith and fair dealing where substantial consideration has been paid by the promisor. We conclude that the implied convenant does not apply.

## FACTUAL AND PROCEDURAL SUMMARY

According to the complaint, Waits agreed to render his services as a recording artist and songwriter exclusively to Third Story Productions (predecessor in interest to plaintiff and appellant Third Story Music, Inc.) from 1972 to 1983, pursuant to written agreements dated July 1, 1972, and July 1, 1977. Third Story Productions transferred its rights in Waits's music to Asylum Records (predecessor in interest to defendant/respondent Warner Communications, Inc.) on August 31, 1972, and to Elektra/Asylum Records (currently a division of Warner Communications, Inc.) pursuant to an agreement dated June 15, 1977.[1] Under these agreements, TSM was to produce master recordings featuring performances by Waits. Warner obtained from TSM the worldwide right to "manufacture, sell, distribute and advertise records or other reproductions (visual or nonvisual) embodying such recordings, to lease, license, convey or otherwise use or dispose of the recordings by any method now or hereafter known, in any field of use, to release records under any trademarks, trade names or labels, to perform the records or other reproductions publicly and to permit the public performance thereof by radio broadcast, television or any other method now or hereafter known, all upon such terms and conditions as we may approve, and to permit others to do any or all of the foregoing . . . ." This clause of the agreements also specifically stated that Warner "may at our election refrain from any or all of the foregoing."[2]

TSM was to receive as a royalty a percentage of the amount earned by Warner from its exploitation of the music. In addition, Warner was required to pay TSM a specific dollar amount as an advance on royalties.[3]

So far as can be ascertained from the record, the parties operated under these agreements without controversy until 1993. At that time, an affiliate of

---

[1]For ease of reference, both Third Story Productions and Third Story Music, Inc., will be referred to hereinafter as "TSM," and Asylum, Elektra/Asylum, and Warner Communications, Inc., will be referred to as "Warner."

[2]Nearly identical language appears in the agreements between Waits and TSM.

[3]Paragraph 34 of the 1972 agreement provides: "Conditioned upon your and the Artist's full and faithful performance of all of the terms hereof, we shall pay you the following amounts: [¶] (a) Four Thousand Dollars ($4,000.00) concurrently with the execution hereof and Four Thousand Dollars ($4,000.00) upon the commencement of each renewal term hereof, if any; and [¶] (b) Four Thousand Eight Hundred Dollars ($4,800.00) during the initial term hereof and during each renewal term hereof, if any, payable in twelve (12) equal

TSM known as Bizarre/Straight Records sought to compile and market an album of previously released Waits compositions, including four which were the subject of the TSM/Warner agreement: On the Nickel, Jitterbug Boy, Invitation to the Blues, and Ruby's Arms. Bizarre/Straight presented a licensing proposal to Warner through its agent Warner Special Products. During negotiations, Bizarre/Straight and TSM learned that Warner had no objection to the deal, but that it would not be made final unless Waits personally approved the licensing request. For reasons unknown, but which TSM claims have to do with Waits's desire to maximize profit on music created after his association with TSM, Waits refused consent. TSM brought suit for contract damages based on breach of the implied covenant of good faith and fair dealing, claiming that Warner "has created an impediment to [TSM] receiving material benefits under the [parties'] agreements and has wrongfully interjected that requirement [the requirement of Waits's approval] into an unknown number of potentially lucrative licensing arrangements, in so doing preventing at least the issuance of the four licenses described above, and other licenses, which TSM will ascertain through discovery."

Warner demurred to the complaint, alleging that the clause in the agreement permitting it to "at [its] election refrain" from doing anything to profitably exploit the music is controlling and precludes application of any implied covenant. The demurrer was sustained on those grounds. TSM contends on appeal, and argued below, that when a party to a contract is given this type of discretionary power, that power must be exercised in good faith, and that permitting the artist to decide whether a particular licensing arrangement was or was not acceptable did not represent a good faith exercise.

## DISCUSSION

### I

When an agreement expressly gives to one party absolute discretion over whether or not to perform, when should the implied covenant of good faith and fair dealing be applied to limit its discretion? Both sides rely on different language in the recent Supreme Court decision in *Carma Developers (Cal.), Inc.* v. *Marathon Development California, Inc.* (1992) 2 Cal.4th

---

monthly installments during each such term. [¶] All such amount shall constitute non-returnable advances against any and all royalties hereunder." The 1978 agreement provided for a payment of $100,000 for each LP produced and delivered by TSM during the first two terms of the agreement, $50,000 of which was to be paid immediately and unconditionally, and $150,000 for each LP produced and delivered by TSM during the third renewal term.

342 [6 Cal.Rptr.2d 467, 826 P.2d 710] to answer that question. In *Carma,* the parties had entered into a lease agreement which stated that if the tenant procured a potential sublessee and asked the landlord for consent to sublease, the landlord had the right to terminate the lease, enter into negotiations with the prospective sublessee, and appropriate for itself all profits from the new arrangement. In the passage relied on by TSM, the court recognized that "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." (2 Cal.4th at p. 372.) The court expressed the view that "[s]uch power must be exercised in good faith." (*Ibid.*)

At the same time, the *Carma* court upheld the right of the landlord to freely exercise its discretion to terminate the lease in order to claim for itself—and deprive the tenant of—all profit from the expected sublease. In this regard, the court stated: "We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. [Citations.] 'The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract "an implication . . . should not be made when the contrary is indicated in clear and express words." 3 Corbin, Contracts, § 564, p. 298 (1960). . . . [¶] As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.' " (2 Cal.4th at p. 374, quoting *VTR, Incorporated* v. *Goodyear Tire & Rubber Company* (S.D.N.Y. 1969) 303 F.Supp. 773, 777-778.)

In reaching its holding, the court cited with approval three cases in which discretionary powers were upheld despite claims that they were not exercised in good faith: *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263 [235 Cal.Rptr. 279]; *Brandt* v. *Lockheed Missiles & Space Co.* (1984) 154 Cal.App.3d 1124 [201 Cal.Rptr. 746]; and *Balfour, Guthrie & Co.* v. *Gourmet Farms* (1980) 108 Cal.App.3d 181 [166 Cal.Rptr. 422]. (2 Cal.4th at pp. 374-376.)

In situations such as the present one, where a discretionary power is expressly given by the contractual language, the quoted passages from

*Carma* set up an apparent inconsistency between the principle that the covenant of good faith should be applied to restrict exercise of a discretionary power and the principle that an implied covenant must never vary the express terms of the parties' agreement. We attempt to reconcile the two.

## II

We first emphasize a long-established rule concerning implied covenants. To be imposed " '(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.' " (*Lippman* v. *Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 142 [280 P.2d 775]; *City of Glendale* v. *Superior Court* (1993) 18 Cal.App.4th 1768, 1778 [23 Cal.Rptr.2d 305].)

With this in mind, we review the authorities cited in *Carma* for the proposition that a discretionary power must be exercised in good faith. In *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503], a bank was given discretion to set nonsufficient fund (NSF) charges to be paid by the customer. The contention was made that since the charges were subject to the bank's sole discretion, the contract lacked mutuality and was, in fact, illusory. (See *Automatic Vending Co.* v. *Wisdom* (1960) 182 Cal.App.2d 354, 357 [6 Cal.Rptr. 31] [" 'An agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable' "].)[4] By its ruling that " '[u]nder California law, an open term in a contract must be filled in by the party having discretion within the standard of good faith and fair dealing,' " the court in *Perdue* was able to impose an objective standard and save an otherwise illusory agreement. (38 Cal.3d at p. 924, quoting *Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 141 [191 Cal.Rptr.

---

[4]The latest edition to the Corbin treatise on contracts puts it more poetically: "If what appears to be a promise is an illusion, there is no promise. Like the mirage of the desert with its vision of flowing water which yet lets the traveler die of thirst, there is nothing there. By the phrase 'illusory promise' is meant words in promissory form that promise nothing. They do not purport to put any limitation on the freedom of the alleged promisor. If A makes an illusory promise, A's words leave A's future action subject to A's own future whim, just as it would have been had A said nothing at all." (2 Corbin, Contracts (rev. ed. 1995) § 5.28, p. 142.)

849].) Interjection of the implied covenant was " 'indispensable to effectuate the intention of the parties' " and was " 'justified [by] legal necessity.' " (*Lippman* v. *Sears, Roebuck & Co., supra,* 44 Cal.2d at p. 142.)

The same resolution was reached in *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474 [289 P.2d 785, 49 A.L.R.2d 496], where it was alleged that a contract permitting the buyer of sugar beets to set the price to be paid was illusory. The court implied an obligation to set the price fairly in accordance with the covenant of good faith and fair dealing, thus protecting the enforceability of the agreement. (*Id.* at p. 484.)

In the same vein, covenants to use "good faith" or "best efforts" to generate profits for the licensor are routinely implied where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties, but the licensee does not expressly promise to do anything. (See, e.g., *Zilg* v. *Prentice-Hall, Inc.* (2d Cir. 1983) 717 F.2d 671, 679-681 [43 A.L.R4th 1163] [discussing the difference between "best efforts" and "good faith"].) As Justice Cardozo put it in one of the earliest cases involving this type of arrangement, *Wood* v. *Lucy, Lady Duff-Gordon* (1917) 222 N.Y. 88 [118 N.E. 214], "It is true that [the licensee] does not promise in so many words that he will use reasonable efforts to place the [licensor's] indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed. [Citations.] If that is so, there is a contract." (222 N.Y. at pp. 90-91 [118 N.Ed. at p. 214.)

In each of these cases, the courts were forced to resolve contradictory expressions of intent from the parties: the intent to give one party total discretion over its performance and the intent to have a mutually binding agreement. In that situation, imposing the duty of good faith creates a binding contract where, despite the clear intent of the parties, one would not otherwise exist. Faced with that choice, courts prefer to imply a covenant at odds with the express language of the contract rather than literally enforce a discretionary language clause and thereby render the agreement unenforceable. As was said in the most recent edition of Corbin's treatise on contracts: "The complaint that a promise is illusory often comes in rather poor grace from the addressee of the allegedly illusory promise, particularly where the addressor is ready and willing to carry out the expression of intention. For this reason, courts are quite properly prone to examine the context to

conclude that the escape hatch was intended to be taken only 'in good faith' or in the 'exercise of a reasonable discretion' or upon some other condition not wholly within the control of the promisor. In which case, the conclusion is that the promise is not illusory." (1 Corbin, Contracts, *supra*, § 1.17, p. 49.) "The tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract. . . . An implied obligation to use good faith is enough to avoid the finding of an illusory promise." (2 Corbin, Contracts, *supra*, § 5.28 at pp. 149-150.)

The need to reconcile contradictory expressions of intent was also the underlying consideration in *April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805 [195 Cal.Rptr. 421], cited by TSM. The contract at issue there contained an express provision allowing one party to erase tapes of a television show produced by the other after broadcast. At the same time, another provision gave the producer the right to sell the old shows in syndication. The producer brought suit for breach of contract and breach of implied covenant after it discovered some of the tapes had been erased. On appeal from a judgment dismissing the complaint without leave to amend, the court acknowledged "[t]he traditional rule" that "a covenant of fair dealing will not be implied to vary the terms of an unambiguous contract." (147 Cal.App.3d at p. 816.) Nevertheless, the court reversed because of the possibility that the contradictory terms could be reconciled by construing the erasure clause to be limited by the implied covenant of good faith and fair dealing. The court noted, "[i]n the case of a contradictory and ambiguous contract . . . the implied covenant may be applied to aid in construction." (*Ibid.*)

The court in *April Enterprises* used the implied covenant to interpret an ambiguous discretionary power. As we have seen, the implied covenant of good faith is also applied to contradict an express contractual grant of discretion when necessary to protect an agreement which otherwise would be rendered illusory and unenforceable. Does a different result ensue where the contract is unambiguous, otherwise supported by adequate consideration, and the implied covenant is not needed to effectuate the parties' expressed desire for a binding agreement? We believe it does, and the cases cited by the court in *Carma* illustrate this point.

In *Balfour, Guthrie & Co.* v. *Gourmet Farms, supra*, a grain producer and a broker contracted for the purchase of grain at a price to be set in the future based on whatever the market was charging when the price was set. The broker paid a specified amount up front and had discretion to set the final price at any time after a missed margin call. Margin calls could be made if

the value of the grain dropped a certain percentage below the amount paid up front. After the value dropped, and the producer missed a margin call, the broker set the price in a falling market. The producer contended this violated the covenant of good faith and "deprive[d] [it] of the fruits of its contract." (108 Cal.App.3d at pp. 183-184.) Relying on the principle that "[a]cts in accord with the terms of one's contract cannot without more be equated with bad faith," the court concluded that the broker could exercise the discretion given by the contract to support its own commercial interest at the expense of the producers. (*Id.* at pp. 190-191.)

In *Brandt* v. *Lockheed Missiles & Space Co.*, *supra*, the employment contract at issue provided that when an employee's invention was deemed of sufficient value to apply for a patent and the patent application was granted, the employee would in all cases receive a total award of $600. In addition, the agreement said the employer "may, but is not obligated" to grant to any employee an additional "Special Invention Award." In response to two employees' claims that failure to make an adequate Special Invention Award in their case violated the covenant of good faith, the court held: "Few principles of our law are better settled, than that '[t]he language of a contract is to govern its interpretation, if the language is clear and explicit. . . .' [Citations.] [¶] Here the language of the parties' contract of employment, i.e., the patent plan, could not be more clear and explicit. It says Lockheed's Invention Awards Committee '*may, but is not obligated to* grant a Special Invention Award,' and that its decision on such matters 'shall be *final and conclusive.*' Lockheed had fully respected the patent plan's language; it may not reasonably be said that in doing so it violated 'a duty of good faith and fair dealing.'" (154 Cal.App.3d at pp. 1129-1130.)

In *Gerdlund* v. *Electronic Dispensers International*, *supra*, 190 Cal.App.3d 263, a party's right to exercise an option to terminate a sales representative agreement was at issue. The contract stated "[n]otice of termination may be given at any time and for any reason" on 30 days' notice. The appellate court reversed the trial court's use of the covenant of good faith to impose a requirement of cause for termination on the ground that "[n]o obligation can be implied . . . which would result in the obliteration of a right expressly given under a written contract. . . ." (190 Cal.App.3d at pp. 268, 277.) The 30-day notice requirement supplied sufficient consideration. (See *R.J. Cardinal Co.* v. *Ritchie* (1963) 218 Cal.App.2d 124, 143 [32 Cal.Rptr. 545] ["A contract may contain a valid provision giving one or either of the parties thereto an option to terminate it within a certain time or on specified conditions. [Citations.] . . . [¶] . . . [A] provision for termination by one or either party after notice for a fixed period is enforceable and does not render the contract illusory."])

In each of these cases, as in *Carma*, one of the parties was expressly given a discretionary power but regardless of how such power was exercised, the agreement would have been supported by adequate consideration. There was no tension between the parties' express agreement and their intention to be bound, and no necessity to impose an implied covenant to create mutuality. The conclusion to be drawn is that courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement. In all other situations where the contract is unambiguous, the express language is to govern, and "[n]o obligation can be implied . . . which would result in the obliteration of a right expressly given under a written contract." (*Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal.App.3d at pp. 277-278.)

## III

 We turn to the question of whether it is necessary in this case to imply a covenant of good faith to protect the enforceability of the contract, or otherwise to effectuate the clear and obvious intent of the parties.

The TSM/Warner agreement states that Warner may market the Waits recordings, or "at [its] election" refrain from all marketing efforts. Read literally, as the trial court did and respondent would have us do, this is a textbook example of an illusory promise. At the same time, there can be no question that the parties intended to enter into an enforceable contract with binding promises on both sides. Were this the only consideration given by Warner, a promise to use good faith would necessarily be implied under the authorities discussed.

The illusory promise was not, however, the only consideration given by the licensee. Under paragraph 33 of the 1977 agreement and paragraph 34 of the 1972 agreement, Warner promised to pay TSM a guaranteed minimum amount no matter what efforts were undertaken. It follows that, whether or not an implied covenant is read into the agreement, the agreement would be supported by consideration and would be binding.[5]

As we see it, Warner bargained for and obtained all rights to Waits's 1972 to 1983 musical output, and paid legally adequate consideration. That it

---

[5]The guaranteed payments involved do not appear to be large in relation to what might be earned from the music of a successful recording artist. But unless the consideration given was so one-sided as to create an issue of unconscionability, the courts are not in a position to decide whether legal consideration agreed to by the parties is or is not fair. The $8,800 annual payments due under the 1972 agreement and the $50,000 minimum payment, plus $100,000

chose not to grant a license in a particular instance cannot be the basis for complaint on the part of TSM as long as Warner made the agreed minimum payments and paid royalties when it did exploit the work. ■ "The courts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably. It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to·make such agreements. The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity." (*Walnut Creek Pipe Distributors, Inc.* v. *Gates Rubber Co.* (1964) 228 Cal.App.2d 810, 815 [39 Cal.Rptr. 767].) ■ TSM was free to accept or reject the bargain offered and cannot look to the courts to amend the terms that prove unsatisfactory.

IV

In its complaint, TSM asserted four causes of action against Warner—breach of contract, conspiracy, rescission, and declaratory relief. All were based on the existence of a duty of good faith in exercising the discretion given to the licensee. As we agree with the trial court that no such duty existed, demurrer was properly sustained to all four causes of action.

DISPOSITION

The judgment is affirmed.

Hastings, J., and Klein (Brett), J.,* concurred.

Appellant's petition for review by the Supreme Court was denied March 21, 1996.

---

to $150,000 for each LP produced by TSM, due under the 1978 agreement amounted to more than the peppercorn of consideration the law requires.

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.