

FILED

AUG 31 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

TOLL BROTHERS, INC., a Delaware
corporation,

        Plaintiff-Counter-Defendant-
        Appellant,

  v.

CHANG SU-O LIN; HONG LIEN LIN;
HONG YAO LIN, individuals,

        Defendants-Counter-
        Claimants, Appellees.

No. 09-16955

D.Ct. No. 08-cv-0987-SC

MEMORANDUM[*]

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, District Judge, Presiding

Re-hearing and Submission July 13, 2011
San Francisco, California

Before: GOULD, CALLAHAN, Circuit Judges, and KORMAN, District Judge.[**]

        Toll Brothers, Inc. ("Toll") appeals from a judgment entered in the United

---

    [*]     This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

    [**]    The Honorable Edward R. Korman, Senior United States District Judge, Eastern District of New York, sitting by designation.

States District Court for the Northern District of California following a bench trial in favor of Chang Su-O Lin, Hong Lien Lin, and Hong Yao Lin ("the Lins"). The complaint, based on diversity of citizenship, arose out of a purchase and sale agreement ("PSA") in which the Lins agreed to sell Toll–a national homebuilder–three separate parcels of land in Dublin, California in three separate closings for a total sale price of $241,500,000. Toll deposited $21,735,000 into an escrow account to be paid out in increments with each property closing. Toll and the Lins successfully closed on two parcels of land, Sub-Areas 1 and 2. The disputed issue here involves the Sub-Area 3 closing scheduled *for the later of* June 30, 2007 or three days after all of the special and general closing conditions had been met.

The Lins had negotiated and executed a "temporary non-exclusive easement" to PG&E across Sub-Area 3 on December 12, 2005 for the construction of temporary overhead power lines for the purpose of carrying out other provisions of the PSA that are not relevant here. By September 2006 all of the work for which the temporary power lines were necessary had been completed. Consequently, the Lins asked PG&E to remove them. Nevertheless, PG&E delayed (for reasons not reflected in the record) quitclaiming the temporary non-exclusive easement it had on the strips of land used to construct the power lines. Notwithstanding numerous emails and phone calls from the Lins to PG&E throughout 2007 attempting to get the easement extinguished,

2

PG&E did not quitclaim the easement until June 8, 2008.

In December 2007, Toll terminated the PSA and filed suit for a return of escrow for Sub-Area 3 in the amount of $7,735,000 alleging *inter alia* that the yet-to-be removed power line easement constituted a breach of the PSA. In response, the Lins alleged that they did not breach the PSA through their conveyance of the power line easement and that they *could not* have breached the PSA by failing to have the easement extinguished by June 30, 2007 because PSA Section 6.1 provided that the Sub-Area 3 closing would occur on the later of June 30, 2007 *or* when all of the special and general closing conditions had been met. This did not occur until June 8, 2008. The Lins argue that they are entitled to retain Toll's $7,735,000 deposit as liquidated damages because Toll unjustifiably terminated the PSA without providing them with a reasonable time to meet the closing conditions.[1]

After a bench trial, the district judge entered a judgment in favor of the Lins. This appeal followed. We agree with the district court's disposition of the various issues raised on appeal. We focus our discussion here on the one issue that we find more troubling than the district judge did and which requires a remand, namely, the consequences of the failure of the Lins to obtain a quitclaim of the power line

---

[1] Section 4.4 of the PSA provides that if the sale of property is not "consummated as a result of the buyer's default under the agreement and if seller is not also in default," the deposit "shall be retained by seller as liquidated damages."

easement across Sub-Area 3 by June 30, 2007, the date Toll alleges was the closing date of the agreement.

I.

The plain language of Section 6.1 of the PSA does not provide a fixed date for closing. Instead, it provides that the closing date is June 30, 2007 or three days after all of the special and general closing conditions have been met. Toll argues that this construction of Section 6.1 renders the PSA illusory because it left either party free to avoid its obligations by deliberately failing to comply with the closing conditions. This argument is without merit because "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," *Foley v. Interactive Data Corp.*, 765 P.2d 373, 389 (Cal. 1988) (citing Restatement (Second) of Contracts § 205 (1981)), and an obligation under a contract is not illusory under these circumstances. *Milenbach v. C.I.R*, 318 F.3d 924, 930 (9th Cir. 2003) (applying California law on the requirement of good faith and fair dealing to hold that "[a]n obligation under a contract is not illusory if the obligated party's discretion must be exercised with reasonableness or good faith."); *see also, Flores v. Am. Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003) (same under federal contract law) (Gould, J.). This principle is complemented by a more specific provision of the California Code which provides that, "[i]f no time is specified [in a contract] for the performance of an act

4

required to be performed, a reasonable time is allowed." Cal. Civ. Code § 1657 (West 2011).

Moreover, the unique circumstances that the Lins cite appear to make this an especially appropriate case to read into the PSA a covenant of good faith and reasonableness. They argue persuasively that "this particular land development contract for the purchase and sale of land and construction of improvements and performance of other obligations, specifically provides for flexible closing dates to enable the parties to perform their respective obligations and to satisfy general and special closing conditions." The PSA, among other things, requires "the seller . . . to make millions of dollars of relatively undefined 'infrastructure' improvements to each of three separate sub-parts of raw land and requires the buyer and seller to comply with multiple conditions in a context of total uncertainty about local governmental and utility approvals from agencies, entities and utilities over which the parties have no control." Indeed, as the district court observed, there were many issues in flux when the parties signed the PSA. This explains the need for the kind of flexible closing date to which the parties agreed conditioned only by the covenant of good faith and fair dealing which is read into the contract under California law.

In ruling on the Lins counterclaim for breach of the covenant of good faith and fair dealing, the district judge did not make any finding that the Lins were acting in

5

good faith in attempting to comply with the closing conditions or that the delay was not unreasonable under all of the circumstances. Consequently, a remand is necessary for this purpose. *See Peak-Las Positas Partners v. Bollag,* 90 Cal. Rptr. 3d 775, 782 (Cal. Ct. App. 2009) ("good faith and reasonableness are questions of fact") (citing *Kendall v. Ernest Pestana, Inc.* 709 P.2d 837, 845 (Cal. Ct. App. 1985)). On remand, the factors considered by the district court in holding that the Lins' breach was not material may also be relevant on this issue as well.

## II.

Nor is there any merit to Toll's argument that the conveyance of the temporary non-exclusive easement to PG&E constituted an independent breach of the PSA that justified Toll's default. Section 13.2 of the PSA upon which Toll relies provides in pertinent part that

> [e]xcept as necessary to comply with the terms of this Agreement, Seller shall not; (a) sell, encumber or transfer any interest in all or any portion of the Property between the date of this Agreement and the Closing Date; (b) take any action that would or could adversely affect title to the Property; or (c) without Buyer's written consent which shall not be unreasonably withheld or delayed, enter into any other agreement of any type affecting the Property that would or could survive the Closing Date.

Passing over the fact that the easement was "temporary and non-exclusive" and that the restrictions on the Seller in Section 13.2 contained an exception for conduct "necessary to comply with the terms of the Agreement," these restrictions were

6

inextricably linked to the existence of a closing date. Indeed, as Toll's attorney acknowledged at oral argument, any breach of Section 13.2 would have been cured if PG&E had quitclaimed the easement back to the Lins prior to the June 30, 2007 closing date for which Toll argued. The PSA, however, did not have a fixed closing date and, on the state of this record, we cannot fix the date when the Lins would have been obligated to close.

In sum, in this case, the PSA's flexible closing dates do not render the contract illusory because the covenant of good faith and fair dealing prevents the Lins from retaining Toll's $7,735,000 deposit while unreasonably or purposefully failing to meet the closing conditions to prevent the closing of Sub-Area 3. Nevertheless, because a question of fact remains as to whether the Lins' acted in good faith and whether the delay in obtaining the quitclaim was reasonable, we remand the case to the district court.

**REMANDED.**

CALLAHAN, CIRCUIT JUDGE, dissenting:

In my view, Toll Brothers was justified in rescinding the purchase and sale agreement ("PSA") due to the Lins' material breach of granting the temporary indefinite easement to PG&E. Accordingly, I dissent.

Section 6.1 of the PSA sets forth two separate dates for closing: (1) the scheduled closing date (i.e., June 30, 2007); and (2) if the conditions for closing are not met by June 30, 2007, the actual closing date, which is three business days after all the closing conditions are eventually satisfied. However, I do not agree with the majority's interpretation, that if the closing was not accomplished by June 30, 2007, § 6.1 automatically and unconditionally extended the closing date. If § 6.1 of the PSA is read as a self-executing clause which indefinitely extends closing until all of the closing conditions are met, even where a closing condition is in the hands of a third party, the PSA becomes illusory.

Section 6.1 established a specific closing date, June 30, 2007, but also provided that the scheduled closing date could be extended if either party anticipated that the closing conditions could not be met by the scheduled closing date and affirmatively invoked the right to extend the closing. However, neither the Lins nor Toll Brothers invoked § 6.1 to extend the time of closing. It was only much later, in litigation, that the Lins asserted that § 6.1 of the PSA entitled them

to an indefinite closing date. I would hold that the Lins can not invoke the "actual closing date" language of § 6.1 because they waived that right by granting an indefinite easement to PG&E. I would further hold that the indefinite easement encumbered the property as of the closing date and therefore constituted a material breach of the PSA. Toll Brothers rescission of the contract was justified when the Lins could provide no date certain as to when PG&E might quitclaim the easement. *See Eason v. Montgomery*, 27 P. 280, 282 (Cal. 1891); *Crim v. Umbsen*, 103 P. 178, 180 (Cal. 1909). Finally, I would hold that there is no need to apply California's implied duty of good faith to extend the closing date because there is no "obvious necessity" for applying the duty. *See, e.g.*, *Third Story Music v. Waits*, 41 Cal. App. 4th 798, 809 (1995).