Filed 9/16/14  Clement v. Solta Medical CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| RICHARD CLEMENT, as Representative, etc., <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> SOLTA MEDICAL, INC., <br><br>     Defendant and Respondent. | A139965 <br><br> (Alameda County <br> Super. Ct. No. RG12659048) |

CLRS Technology Corporation (CLRS) developed CLARO, a dermatological product for acne treatment.  It agreed to merge with a subsidiary of Solta Medical, Inc. (Solta), which had greater resources for marketing and sales.  Under terms of an "Agreement and Plan of Merger" (Merger Agreement), former CLRS managers and shareholders would receive contingent payments, dependent upon on sales of CLARO. The Merger Agreement provided that Solta would have "complete discretion" over CLARO marketing and sales.  Richard Clement, as the former CLRS shareholders' representative, alleges Solta breached the contract and implied covenant of good faith and fair dealing by failing to market or sell CLARO, thus denying former shareholders additional compensation.  The trial court sustained Solta's demurrer, ruling that Solta did not breach the contract and the implied covenant could not alter the "complete discretion" granted to Solta in the contract.  We affirm.

1

# I.    BACKGROUND

In reviewing the trial court's order sustaining the demurrer, we accept as true properly pleaded factual allegations of the complaint. (*Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116, 1120.) Where a complaint incorporates terms of a contract, we consider those terms as part of the pleading. (*Ibid.*) Clement's original and first amended complaints, each with the Merger Agreement attached, set forth the following facts.

A.    *The Merger Agreement*

CLRS developed and produced dermatologic treatments based on intense pulsed light and heat including CLARO, which used intense pulsed light to treat acne. In October 2010, CLRS[1] and Solta signed the Merger Agreement whereby a Solta subsidiary (Solta Temp, Inc.) merged into CLRS. CLRS became the surviving company but with the articles, bylaws, officers and board of directors of Solta Temp, Inc.[2]

Under the Merger Agreement, existing CLRS shareholders exchanged their CLRS stock for the right to receive certain "earnout" payments triggered by specified revenue or operating income milestones during "earnout periods" that spanned from January 1 to December 31, 2011. Two former CLRS managers, Richard Oberreiter and James Pereyra, also had the right to receive earnout payments if certain CLARO sales milestones were met. Payments to the shareholders and managers were to go through Clement as their designated representative. Solta had to certify the earnout payment amounts. Clement, as the former shareholders' and managers' representative, could dispute those amounts and if necessary submit the matter to binding arbitration before an arbitrating accountant.

---

[1] The Merger Agreement was signed by a CLRS officer on behalf of CLRS and also by Clement as representative of CLRS shareholders.

[2] Clement describes the merger as follows: "CLRS would merge with and into Solta and that Solta would be the surviving company of the merger." Solta similarly describes the merger as "structured so that CLRS would be merged into a wholly-owned subsidiary of Solta."

Solta further agreed to assume or satisfy all the outstanding liabilities of CLRS. The contingent earnout payments for CLRS shareholders would be reduced by the amounts paid to satisfy the CLRS indebtedness. Payouts at closing totaled $529,915.46 and included payments to Clement, Oberreiter, and Pereyra. A schedule of other company debt outstanding as of the closing date, and assumed by Solta, totaled $232,199.09, including additional amounts owed to Oberreiter and Pereyra.

Principally at issue here are two provisions set forth in article V of the Merger Agreement, "ADDITIONAL AGREEMENTS." Section 5.02,[3] "Further Action; Reasonable Best Efforts," provided in relevant part: "(b) Upon the terms and subject to the conditions of this [Merger] Agreement, each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Merger. *In case, at any time after the Effective Time, any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of each party to this* [*Merger*] *Agreement shall use their reasonable best efforts to take all such action.*" (Italics added.)

Section 5.06, "Company Products and Services from and after the Effective Time," provided: "[Solta], [CLRS] and the Representative [(Clement)] acknowledge and agree that [*Solta*] *shall have complete discretion in the ordinary course of its business over all matters relating to any* [*CLRS*] *Products and Services from and after the Effective Time*, including, but not limited to, any matter relating to the development, testing, regulatory submission or regulatory approval, if applicable, manufacturing, marketing, sales, distribution, pricing, service or maintenance thereof." (Italics added.)

B.    *The Lawsuit*

In December 2012, Clement sued Solta in his capacity as representative of CLRS's former shareholders. The original complaint alleged that in November and December 2010, Solta had prepared and approved formal budgets for the sale and

---

[3] All undesignated section references are to the Merger Agreement.

3

marketing of CLARO, but "decided shortly after the start of the earnout periods that it would not support CLARO sales with marketing efforts during the earnout period." Solta misrepresented its CLARO marketing plans to shareholders, stating in May 2011 that it was "ramping up production for CLARO" and that it had spent money on sales and marketing of CLARO in the first quarter of 2011. In fact, Solta "had not authorized the kind of investment in marketing [CLARO] that had been anticipated at the time of the acquisition of CLRS." In August 2011, Solta falsely stated it expected CLARO and another project to " 'drive significant top line growth in the second half of the year.' " In fact, "Solta had already made a decision to substantially cease marketing efforts for CLARO during the earnout period." In November 2011, Solta reported that it had determined as of September 30, 2011, that it would not make earnout payments because the revenue milestones would not be achieved, and that prediction became true. Clement alleged that Solta breached the Merger Agreement and implied covenant of good faith and fair dealing by "failing to use its reasonable best efforts to sell or market CLARO in breach of Section 5.02(b) . . . . Solta essentially ceased providing marketing and support for CLARO in early 2011."[4]

Solta demurred to the complaint, arguing the theory of the complaint was "***explicitly*** foreclosed by the unambiguous terms of the parties' contract. . . . [The parties] agreed that Solta would have 'complete discretion' regarding 'any matter relating to the development, testing, . . . manufacturing, marketing, sales [or] distribution' of the product in question." The trial court agreed the complaint failed to state a valid claim as pled. "[Clement's] claims for breach of contract and breach of covenant are governed by the rules of contract interpretation discussed in *Third Story Music Inc. v. Waits* (1995) 41 Cal.App.4th 798, in which defendant record company had the contractual right to, at its election, refrain from doing anything to market the music that was the subject of that contract. The court in *Third* [*Story*] *Music* observed that, where (as here) a discretionary

---

[4] Clement also alleged that this conduct violated Business and Professions Code section 17200 et seq. In his first amended complaint, however, Clement abandoned this claim.

power is expressly given by contractual language, there was an apparent inconsistency between the principle that the covenant of good faith should be applied to restrict exercise of that discretionary power, and the principle that an implied covenant must never vary the express terms of the parties' agreement. (*Id*. at [pp.] 803–804.) The court reconciled that inconsistency by finding that, read literally, the discretionary contract provision was 'a textbook example of an illusory promise,' and if that were the only consideration given by defendant a duty to exercise that discretion in good faith would necessarily be implied. (*Id*. at [p.] 808.) However, because the illusory promise embodied in the contract's discretionary provision was not the only consideration given by defendant, the court held that the implied covenant of good faith and fair dealing could not be used to vary the express terms of the contract's discretionary provision. (*Id*. at [pp.] 808–809.) Therefore, whether or not [Clement] here can allege a viable claim for Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing, in which [Solta] had an implied obligation to use [its] 'reasonable best efforts' to sell or market CLARO, depends largely on what consideration [Clement] and the other CLRS shareholders actually received for entering the [Merger] Agreement." The court sustained the demurrer with leave to amend "to clearly allege (1) what consideration, if any, [Clement] and the other CLRS . . . shareholders were given for entry into the [Merger] Agreement . . . , and (2) what provision of that [Merger] Agreement set forth the compensation (if any) that [Clement] and the other shareholders were actually paid."

In a first amended complaint, Clement alleged that "Solta contracted to pay all of the consideration owing to the common shareholders of CLRS in the form of delayed earnout payments . . . ." (Italics & boldface omitted.) Because this was the only consideration for the common shareholders, "the parties discussed and understood that one of the fundamental purposes of the Merger Agreement was to enable sales of the CLARO product line through Solta's superior resources and access to the retail sales channel. [¶] . . . Indeed, CLRS executives . . . provided Solta with detailed sales projections that had accompanying budgets for the marketing of CLARO. These budget and sales projections formed the basis of the earnout formulas . . . [and t]he CLRS

5

common shareholders agreed to the Merger Agreement in reliance on Solta's representations during negotiation of the Merger Agreement that it would support CLARO through marketing efforts, particularly through the retail sales channel. [¶] . . . Solta's executives discussed with CLRS executives various channels through which the new merged business would market CLARO in the ordinary course in order to generate sales to trigger the earnout formulas . . . ." However, "[r]ather than market CLARO during the earnout periods in the ordinary course of business as it was required to [do], Solta essentially halted its marketing of CLARO. [¶] . . . [D]uring the earnout periods, between January 1 and December 31, 2011, Solta executives made a decision to significantly curtail marketing of CLARO and ignore the marketing plans they had agreed to . . . . [¶] . . . Despite being advised on multiple occasions by Richard Oberreiter and others that Solta was not adequately supporting the marketing of CLARO during the earnout periods, Solta executives refused to do so. For example, Solta refused to partner with Sephora to market and sell CLARO through its stores during the earnout periods, despite the fact that Sephora was a key potential retail channel for the product. [¶] . . . By refusing to take such minimal marketing efforts, Solta deliberately eliminated any possibility of an earnout payment to the [CLRS former] shareholders and breached Sections 2.05[5] and 5.02(b) of the Merger Agreement." Clement alleged that the "complete discretion" provided to Solta in section 5.06 was only "boilerplate language" which "simply acknowledged Solta's right to run its business in the *ordinary course* while upholding the purposes of the Merger Agreement . . . . Importantly, the parties did not intend or agree to provide Solta unfettered discretion with respect to whether it could

---

[5] Section 2.05 provides: "<u>Further Assurances</u>. [¶] If at any time before or after the Effective Time Parent reasonably believes or is advised that any further instruments, deeds, assignments or assurances are reasonably necessary or desirable to consummate the Merger or to carry out the purposes and intent of this Agreement at or after the Effective Time, then [CLRS], [Solta], the Surviving Corporation and their respective officers, directors, managers or managing member, as the case may be, shall execute and deliver all such proper deeds, assignments, instruments and assurances and do all other things reasonably necessary or desirable to consummate the Merger and to carry out the purposes and intent of this Agreement."

unilaterally refrain from marketing CLARO or otherwise game the earnout structure set forth in the Merger Agreement."

Solta demurred to the first amended complaint, again arguing Clement's claims were explicitly foreclosed by section 5.06's "complete discretion" language. It argued, consistent with the prior trial court order, that the implied covenant of good faith and fair dealing could override the express "complete discretion" contract language only if the contract would otherwise be illusory because it provided no other consideration to CLRS. However, the Merger Agreement provided CLRS with other consideration: Solta "(i) assumed specified CLRS indebtedness; and (ii) paid CLRS shareholders hundreds of thousands of dollars independent of the earnout." (Italics & boldface omitted.)

Solta argued that the earnout payments were made conditional by the parties "[g]iven the uncertainties associated with CLARO and its prospects . . . . [T]he parties expressly and unequivocally agreed that Solta would have 'complete discretion' over all decisions relating in any way to the manufacturing, marketing, sales and distribution of CLARO[.] [¶] . . . [¶] As the [first amended complaint] acknowledges, Solta publicly expressed its high hopes for sales of CLARO and noted that it had committed substantial resources to production, sales and marketing of it. [Citation.] However, CLARO proved to be far less successful than the parties anticipated and—as [Clement] concedes—sales never reached levels high enough to trigger the earnout provisions."

The court sustained the demurrer without leave to amend. "[Clement] fails to allege facts supporting [his] claim that [Solta] breached the Merger Agreement, or any Covenant of Good Faith and Fair Dealing pertaining to that Agreement, by failing to use 'its reasonable best efforts' to sell or market CLARO. Section 5.06 of the Agreement expressly gave [Solta] 'complete discretion' over all matters pertaining to the marketing and sales of any company products including CLARO, and it did not provide that [Solta] must use its 'reasonable best efforts' to sell or market any products. An implied covenant cannot be used to prohibit a party from doing that which is expressly permitted by the contract, and implied terms should never be read to vary express terms. (See *Carma Developers* (*Cal.*) *Inc. v. Marathon Development California Inc.* (1992) 2 Cal.4th 342,

374 [(*Carma*)].)  Assuming arguendo that there was a conflict or ambiguity between the general provisions of Section 5.02(b) (requiring parties to use 'reasonable best efforts' to carry out the purposes of the [Merger] Agreement) and Section 5.06 (granting [Solta] 'complete discretion' over all matters relating to marketing or sales of products), the more specific provision—5.06—would control.  (See Code [Civ. Proc., §] 1859.)

"Although the Court could read an implied covenant into the [Merger] Agreement that [Solta] made a good faith effort to sell or market the product if obviously necessary to prevent the [Merger] Agreement from becoming illusory (see, e.g., *Third Story Music Inc. v. Waits*[*, supra,*] 41 Cal.App.4th [at pp.] 808–809), [Clement] does not allege facts demonstrating such necessity.  An implied covenant will not be read into an agreement to vary its terms if the agreement is supported by legally adequate consideration.  ([*Ibid.*]; see also *Thrifty Payless Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1061–1063.)  Although First Amended Complaint paragraphs 14 and 39 allege that the holders of CLRS common stock did not receive any consideration from the merger apart from earnout payments contingent on future sales of CLARO, the [Merger] Agreement itself clearly indicates that legally adequate consideration was paid by [Solta].  (See Section 1.01(a) . . . , providing for 'Aggregate Merger Consideration['] of $2 million less the amount of indebtedness as of the closing date,[6] as well as Schedule I to the [Merger] Agreement, providing for payments to [Clement] and others of over $500,000 within three days of the closing date.)  [Solta's] assumption of CLRS'[s] debt constitutes consideration sufficient to support the agreement.  (See, e.g., *Beatrice Co. v. State Bd. of Equalization* (1993) 6 Cal.4th 767, 782–783.)

"Finally, [Clement's] reliance on *Locke v. Warner Bros. Inc.* (1997) 57 Cal.App.4th 354 is unavailing.  When, as in *Locke*, a promisor's obligations deal with

---

[6] The "Aggregate Merger Consideration" was a figure used to determine the amount of earnout payments to former shareholders in the event such payments were triggered by the company's reaching designated milestones.  (§ 2.01(e)(iii)–(iv), (g)(i)–(ii).)  Solta does not cite to any term of the Merger Agreement that required the Aggregate Merger Consideration amount to be paid as a term of the merger separate from the earnout payments.

purely subjective matters such as artistic judgment, a covenant of good faith is implied to supply adequate consideration to support the contract. (See *Storek & Storek Inc. v. Citicorp Real Estate Inc.* (2002) 100 Cal.App.4th 44, 61.) But where, as here, a promisor's performance calls for satisfaction as to financial considerations, commercial value, or other objective considerations, the contract is not illusory and no covenant of good faith is implied, because the promisor's ability to claim dissatisfaction is limited by the standard of reasonableness. (*Id.* at [pp.] 57–61.) [Clement] alleges no facts suggesting that [Solta's] purported failure to adequately market CLARO was commercially unreasonable." The court dismissed the action.

## II.  DISCUSSION

"On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo:  we exercise our independent judgment about whether the complaint states a cause of action as a matter of law. [Citation.] First, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. Next, we treat the demurrer as admitting all material facts properly pleaded. Then we determine whether the complaint states facts sufficient to constitute a cause of action. [Citations.] [¶] We do not, however, assume the truth of contentions, deductions, or conclusions of law. [Citation.]" (*Stearn v. County of San Bernardino* (2009) 170 Cal.App.4th 434, 439–440.) "[T]he allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties. [Citations.]" (*Kotlar v. Hartford Fire Ins. Co., supra,* 83 Cal.App.4th at p. 1120.)

" 'Where a written contract is pleaded by attachment to and incorporation in a complaint, and where the complaint fails to allege that the terms of the contract have any special meaning, a court will construe the language of the contract on its face to determine whether, as a matter of law, the contract is reasonably subject to a construction sufficient to sustain a cause of action for breach.' [Citation.]" (*Davies v. Sallie Mae, Inc.* (2008) 168 Cal.App.4th 1086, 1091.) "Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent. [Citation.] Extrinsic evidence can include the

9

surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]" (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980.) If the proposed interpretation is "clearly erroneous," the demurrer may be sustained. (See *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239.)

We first address Solta's arguments regarding the implied covenant of good faith and fair dealing.

A.      *Breach of the Implied Covenant of Good Faith and Fair Dealing*

" ' "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (Rest.2d Contracts, § 205.) This duty has been recognized in the majority of American jurisdictions, the Restatement, and the Uniform Commercial Code. [Citation.]' [Citation.]" (*Carma, supra,* 2 Cal.4th at pp. 371–373.)

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. [Citations.] . . . [¶] . . . [¶] [T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.] . . . [U]nder traditional contract principles, the implied covenant of good faith is read into contracts 'in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' [Citation.]" (*Carma, supra,* 2 Cal.4th at pp. 372–373.) For the implied covenant to be imposed, " ' "the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; . . . [and] it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it . . . ." ' [Citations.]" (*Third Story Music, Inc. v. Waits, supra,* 41 Cal.App.4th at p. 804.)

Courts have repeatedly held that the implied covenant applies to contract clauses that give one party discretion over a class of activity. Several of these cases hold that the covenant is violated by a categorical refusal to engage in the activity. In *Locke v. Warner*

10

*Bros., Inc., supra,* 57 Cal.App.4th 354, for example, Warner Brothers paid for a three-year " 'nonexclusive first look' " at Locke's movie proposals and a " 'pay or play' " directing deal. Under both elements of the contract, Warner Brothers had to pay Locke a fixed sum of money but had no obligation to accept a proposal or hire Locke to direct a film. Nevertheless, the court held the implied covenant applied to Warner Brothers' exercise of discretion under the contract and further held that evidence Warner Brothers never intended to accept a deal or have Locke direct a film would establish a violation of the implied covenant. (*Id.* at pp. 358, 364–367.) In *Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, event promoter Pasadena Live paid for renovations to a City-owned amphitheater in exchange for the City's consideration of Pasadena Live's event applications. The contract acknowledged that Pasadena Live proposed to produce 11 events in 2000 and 2001. After approving five such events, the City allegedly categorically refused to approve any more Pasadena Live events unless it met conditions not set forth in the contract. The court held that the implied covenant applied to the City's consideration of the proposals and that the City's refusal to even consider additional proposals by Pasadena Live, if proven, was a violation. (*Id.* at pp. 1091–1093.)

The implied covenant does not apply to all discretionary contract provisions, however. The implied covenant ordinarily cannot override the *express* terms of a contract. (*Carma, supra,* 2 Cal.4th at p. 374.) " 'The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract "an implication . . . should not be made when the contrary is indicated in clear and express words." [Citation.] . . . .' [Citation.]" (*Ibid.*)

Thus, if the contract gives a party the discretion to do the specific act that is alleged as a breach of the implied covenant, the implied covenant does not apply. In *Carma*, for example, a commercial lease prohibited the lessee from subletting the

11

premises without prior written consent of the landlord, " 'which consent shall not be unreasonably withheld.' " (*Carma, supra,* 2 Cal.4th at p. 351.) However, the lease also expressly allowed the landlord, when faced with a proposed sublease, to terminate the lease rather than approve the sublease and to enter into its own new lease with the intended sublessee and capture any increase in the rent. (*Id.* at pp. 351–352 [" 'Tenant shall not be entitled to any portion of the profit, if any, which Landlord may realize on account of such termination and reletting' "].) The landlord exercised the latter right in order to capture higher rent in a rising market. The court rejected the argument that the implied covenant of good faith and fair dealing barred the landlord from exercising that right unless it had a reasonable objection to the proposed sublessee. "[S]uch interpretation would be contrary to the express language and natural import of [the latter provision]. . . . [I]t was certainly within the reasonable expectations of the parties that [the landlord] might terminate the lease upon a proposed transfer in order to claim for itself appreciated rental value of the premises." (*Id.* at pp. 373–374.)

Similarly, where a contract provided, " 'If, for any reason . . . the Lease Term has not commenced by June 30, 2008, Tenant and Landlord shall each have the right to terminate this Lease by giving written notice to the other,' " the implied covenant did not apply to a decision to terminate under this clause. (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC, supra,* 185 Cal.App.4th at pp. 1060–1062; see also *New Hampshire Ins. Co. v. Ridout Roofing Co.* (1998) 68 Cal.App.4th 495, 501, 504–505 [contract expressly allowed insurer to settle any claim " 'at [its] discretion' " and to require the insured to reimburse deductible amounts paid to effect the settlement]; *PMC, Inc. v. Porthole Yachts, Ltd.* (1998) 65 Cal.App.4th 882, 889–892 [contract expressly allowed purchaser of yacht to terminate contract by rejecting trial run or maritime survey and parties understood this could be done for any reason].)

The implied covenant also does not apply if a contract gives one party discretion over a class of activity (as in *Locke v. Warner Bros., Inc., supra,* 57 Cal.App.4th 354) but also expressly allows the party to *refrain* from the activity. Thus, where a contract gave a music studio the discretionary right to sell certain recordings, but further provided the

studio " 'at [its] election' " could refrain from doing so, the implied covenant did not apply to the studio's decision not to sell a recording. (*Third Story Music, Inc. v. Waits, supra,* 41 Cal.App.4th at pp. 808–809.) Similarly, where a contract gave the Disney corporation the right to license use of film characters for promotion or advertising "as [Disney] may see fit," and also provided that Disney "shall not be under any obligation to exercise any of the rights granted" under the contract, the implied covenant did not apply to Disney's licensing decisions. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1112–1113, 1121–1123 & fn. 7.)

The only exception to the rule that the implied covenant cannot vary the express terms of a contract is the circumstance where the contract would otherwise be contradictory, ambiguous or illusory. (*Third Story Music, Inc. v. Waits, supra,* 41 Cal.App.4th at pp. 805–806.) In *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 813–814 for example, the contract granted both parties the right to seek syndication of a television program and allowed one party to erase videotapes of such program. In order to resolve the inherent contradiction, the court construed the erasure clause to be limited by the implied covenant, allowing erasure only if future syndication of the program was not feasible. (*Id.* at pp. 816–817.)

The contract here, in section 5.06, granted Solta discretion over the marketing and sale of CLARO. It did not expressly provide authority for Solta to refrain entirely from marketing and selling CLARO or to do any of the specific acts Clement alleges as breach of the covenant. The Merger Agreement does, however, grant Solta "*complete* discretion" over the marketing and sale of CLARO. In our view, this is significant distinction. "Complete discretion" must mean something more than mere "discretion." Ordinarily, contracts should not be construed in a manner that renders terms superfluous. (See *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1455 ["the interpretation of 'sudden' [in an insurance contract] must include a temporal component; otherwise, the word is rendered mere surplusage"].) The Supreme Court has described a contract clause that granted " 'absolute and sole discretion' " to one party as "broad and express language" that made the implied covenant inapplicable. (*Steiner v.*

13

*Thexton* (2010) 48 Cal.4th 411, 419–420.) A court may not imply a covenant of good faith and fair dealing which contradicts the express terms of a contract. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc., supra,* 100 Cal.App.4th at p. 55.) Whether or not a grant of "complete discretion" over an activity might be broad enough to allow a party to refrain from an activity within the contemplation of a contract entirely, we view it as at least sufficiently broad to necessarily bar a court from second-guessing how the activity was carried out.

Here, Clement has essentially conceded that Solta did not completely refrain from marketing and selling CLARO in the earnout period. In the original complaint, he alleged that during the earnout period Solta "had not authorized *the kind of investment* in marketing [CLARO] *that had been anticipated* at the time of the acquisition of CLRS" and Solta "made a decision to *substantially cease* marketing efforts for CLARO during the earnout period." (Italics added.) Specifically, "Solta *essentially* ceased providing marketing and support for CLARO *in early 2011*." (Italics added.) In his first amended complaint, Clement similarly alleged "[r]ather than market CLARO during the earnout periods in the ordinary course of business as it was required to [do], Solta essentially *halted* its marketing of CLARO. [¶] . . . [D]uring the earnout periods, between January 1 and December 31, 2011, Solta executives made a decision to *significantly curtail* marketing of CLARO and ignore the marketing plans they had agreed to . . . . [¶] . . . Despite being advised on multiple occasions by Richard Oberreiter and others that Solta was *not adequately supporting* the marketing of CLARO during the earnout periods, Solta executives refused to do so. For example, Solta refused to partner with Sephora to market and sell CLARO through its stores during the earnout periods, despite the fact that Sephora was a key potential retail channel for the product." (Italics added.) The allegations of Clement's pleadings, taken as true, establish that Solta did not completely refrain from marketing and selling CLARO, but rather marketed CLARO during the earnout period in a manner, and for a duration, that Clement believed to be inadequate. The agreement negotiated by the parties gave Solta the "complete discretion" to do so.

14

Nor did the lack of earnout payments render the contract illusory for lack of consideration. The former common shareholders of CLRS received consideration for the merger not only in the form of Solta's marketing efforts, but in Solta's assumption of substantial debt of CLRS, and payment of more than $500,000 to CLRS creditors, including CLRS former shareholders and managers. The Merger Agreement was therefore supported by ample consideration, and enforceable. Clement cites no relevant authority to support his argument that the contract would be illusory unless the former shareholders received direct consideration in their role as shareholders (i.e., not as creditors of CLRS).

Clement argues that section 5.02(b), requiring that the parties use "reasonable best efforts" to take "any further action [that] is necessary or desirable to carry out the purposes of this [Merger] Agreement" was intended to ensure that Solta would take steps to effectuate the parties' mutual intent and that Solta was thereby obligated to "carry out some type of marketing and selling of CLARO."[7] As Solta notes, section 5.02(b) makes no mention of sales, marketing or CLARO. The interpretation Clement offers for the general provisions of section 5.02(b) is directly at odds with the more specific provisions of section 5.06, providing Solta with "complete discretion . . . over all matters relating to any [CLRS] Products and Services . . . including, but not limited to, any matter relating to the development, . . . manufacturing, marketing, sales, distribution, pricing, service or maintenance thereof." We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 919.) Moreover, a specific provision prevails over a general one. (Code of Civ. Proc., § 1859.)

The court properly sustained the demurrer to the implied covenant claim without leave to amend.

---

[7] Clement contends that the question of how much marketing and selling of CLARO adequately constitutes "reasonable best efforts" is a question for a jury.

15

B.     *Breach of Contract*

Clement has not alleged a breach of the express terms of the Merger Agreement by Solta.  The only breach alleged was inadequate marketing and sales of CLARO, but we have concluded that Solta did not breach a contract provision granting it complete discretion over such marketing and sales even taking the implied covenant into consideration.  It follows that the bare breach of contract claims fails as well and the trial court properly sustained Solta's demurrer without leave to amend.

### III.     DISPOSITION

The judgment is affirmed.  Clement shall pay Solta's costs on appeal.


_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.