Filed 10/10/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CALIFORNIA DENTAL ASSOCIATION et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>DELTA DENTAL OF CALIFORNIA et al.,<br><br>     Defendants and Respondents. | A170821<br><br>(San Francisco City & County Super. Ct. No. CGC-22-603753) |

Delta Dental of California (Delta) is a nonprofit mutual benefit corporation (Corp. Code, § 7110 et seq.) with thousands of dentist members, for whom the main benefit of membership is the ability to enter into a Participating Provider Agreement (Provider Agreement) with Delta. Under a Provider Agreement, a dentist gains access to Delta plan enrollees as patients. In return, the dentist agrees to accept the fee payment set by Delta as full payment for services rendered.

Plaintiff dentists are both "members" of Delta in its corporate capacity (Corp. Code, § 7310) and individual parties to Provider Agreements with Delta.[1] They sued Delta and several of its directors after Delta exercised its right under the Provider Agreement and associated documents to make changes to future fee payments. Plaintiffs claim that in making these

---

[1] The California Dental Association (CDA) is also a plaintiff, asserting associational standing to sue on behalf of its members who are Delta dentists. For brevity, we refer to plaintiffs simply as "dentists."

1

changes Delta violated the covenant of good faith and fair dealing implied in the Provider Agreement and certain of its directors violated fiduciary duties allegedly owed plaintiffs as members of Delta.

After an initial round of challenges to the pleadings, the trial court sustained demurrers by all defendants without leave to amend. With respect to the implied covenant claim against Delta, the court ruled the company could not breach the covenant by doing what the Provider Agreement and associated documents expressly authorize it to do. As to the fiduciary duty claim against the Delta directors, the court ruled they owe plaintiffs no fiduciary duty in connection with Delta's exercise of its contractual right under the Provider Agreement and associated documents to make future changes to its fee structure. We affirm.

## BACKGROUND

Created in 1955 to " 'provide dental benefit coverage through contracts with independent professional service providers,' " Delta is the state's largest provider of dental plans. It is a nonprofit mutual benefit corporation (Corp. Code, § 7110 et seq.)—meaning a nonprofit corporation created to benefit its members, not the public as a whole. It has two classes of members: corporate members and dentist members. (See *id*., § 7310.) Corporate members set policy and control Delta's governing board. Dentist members enter into Provider Agreements with Delta to provide dental care to dental plan enrollees through Delta's premier network or preferred provider organization (PPO).[2]

---

[2] These contracts were formerly called Participating Dentist Agreements. We refer to all versions of the dentist agreements as Provider Agreements.

2

The history of the instant dispute began in 2011, when Delta announced the first of two prior changes to the Provider Agreement for premier network dentists. The trial court took judicial notice of documents reflecting this history, which we now summarize.

**2011 Provider Agreement and Participating Dentist Rules**

As of 2011, dentists joining Delta's premier network had to execute a "[Provider] Agreement and Confidential Fee Filing Form" (some capitalization & boldface omitted) enabling them to submit a list of their fees for specified procedures. Dentists could thereafter annually submit revised fees, and Delta would "use the fees and other data to calculate allowances for claims that [the dentist would] submit for eligible patients."

Delta subsequently amended the definition of " 'Contracted Fee' " in the "Participating Dentist Rules" (Rules), which the Provider Agreement incorporated by reference. The amended Rules provided that Delta would set a maximum reimbursement limit on a premier dentist's contracted fee (also called the "maximum amount") by making "an actuarial calculation, and taking into account filed fees, general inflation rates, health care inflation rates, market pricing by competitors, and acceptability by customers." The Provider Agreement, in turn, was amended to state the " 'maximum amount will not be reduced unless participating dentists' filed or submitted fees decrease to such an extent that Delta . . . is warranted in reducing the maximum amount allowed.' "

**The 2013 Changes to the Participating Dentist Rules and 2014 Lawsuit**

In 2013, Delta gave notice of further amendments, one of which would have deleted from the Provider Agreement the limitation quoted above constraining reductions of the allowed maximum amount. This precipitated the filing of a lawsuit in 2014–a class action against Delta challenging the

proposed amendments and alleging that, in calculating new maximum amounts to cap premier dentists' fees, Delta had relied not on the actuarial calculation required by the 2011 Rules, but on a study of " 'industry benchmark data.' " The plaintiffs claimed Delta thereby breached both the express terms of the Provider Agreement and incorporated Rules and the implied covenant of good faith and fair dealing inherent in the agreement, as well as violated the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.).

***The 2018 Settlement and Changes to the Participating Dentist Rules***

Four years later, in 2018, the parties settled the 2014 action. The settlement documents included an amended Provider Agreement and amended Rules.

The changes to the Rules relevant here pertain to provisions titled, "Notice of Rules, Procedures[,] and Policies." (Boldface omitted.) As amended, these provisions state (a) Delta "has the right to make amendments to [Provider Agreements], including these [R]ules, and any other rules, policies, or procedures . . ."; (b) "[a]ny material amendment(s) made as provided above is/are binding upon . . . participating dentists and effective 120 calendar days from the time Delta . . . mails . . . notice to the participating dentist"; and (c) "[i]f the dentist declines to be bound by the amendment(s), the dentist shall so advise Delta . . . and terminate [their Provider Agreement] within the 120-calendar day notice period." (Underscoring omitted.)

The settlement also amended the provision of the Rules governing contracted fees. As amended, the Rules state, "The 'Contracted Fee' is subject to and cannot exceed a maximum amount allowed as determined by Delta . . . for the eligible patient's dental program, as well as the [dentist's] network, specialty, and location." (Underscoring & fn. omitted.) In addition,

4

the parties agreed Delta would delete the provision that previously stated the maximum amount "is based on an actuarial calculation, and taking into account filed fees, general inflation rates, health care inflation rates, market pricing by competitors, and acceptability by customers." In its place, the Rules now state, "In determining the maximum amounts allowed for Contracted Fees (e.g., Premier and PPO) . . . , Delta . . . may take into account, among other things, market and competitive conditions." (Underscoring & fn. omitted.) The Rules further state, "In the event of a decrease in Premier Contracted Fee maximum amounts allowed or levels or amounts of fee reimbursement generally applicable to Premier dentists . . . , Delta . . . will provide participating dentists . . . 120 calendar days' notice. Such notice will [inform] each affected Premier dentist [of] (1) [their] Contracted Fees affected by the reduction(s) and (2) the potential financial impact of the reduction(s) on [their] Contracted Fee reimbursements . . . based [on their recent billing]. . . . If the dentist does not wish to accept the new Premier Contracted Fees, [they] shall so advise Delta . . . and terminate [their participant] agreement within the 120 calendar day notice period." (Underscoring omitted.)

The settlement agreement, itself, declares Delta "has the right to determine unilaterally the provisions of the [Provider Agreement] (including the Rules), including without limitation any provisions relating to fee reimbursement; levels or amounts of fee reimbursement; methods, procedures[,] or formulas for determining fee reimbursement; . . . and Delta['s] right to amend the [Provider Agreement] (including the Rules), provided that nothing contained herein shall be construed to constitute an

5

agreement that Delta . . . may violate any statutory or common law right by future conduct."[3]

### *The 2023 Changes to the Participating Dentist Rules and this Lawsuit*

It was against this backdrop that, in September 2022, Delta gave plaintiffs the requisite 120 days' notice of the amendments to the Rules now at issue.

According to plaintiffs, these amendments "substantially reduce fees across the board" for premier specialty dentists; reduce fees "for more frequently billed services" by premier general dentists "while increasing (often modestly) fees for less common services"; detrimentally "modify the entire fee determination process for Premier Dentists" by eliminating their ability to file their own fee schedules and raise their fees annually, subjecting them instead to standard schedules; and on balance lower fees "for many PPO Dentists" by materially reducing fees for some procedures while raising them negligibly for others. Plaintiffs also complain the amendments were approved in a single, brief committee meeting without any effort to determine participating dentists' needs, without procuring any written materials on or independent analysis of the proposed changes, and under pressure to quickly approve the changes. Further, while plaintiffs, within the 120-day notice

---

[3] While all 2014 plaintiffs and settlement class members were premier dentists, and the 2018 settlement documents defined the Provider Agreement as the "contract that a dentist signs to become a Premier Dentist," and the Rule amendments as applying to "all Premier Dentists," the amended Rules use non-premier-specific terms and refer to both premier and PPO dentists, facilitating their incorporation in Provider Agreements for both the premier and PPO networks. Plaintiffs here include both premier and PPO dentists, but no party has drawn any distinction as to the operative effect of the Rules based on a dentist's network affiliation. Therefore, neither do we.

6

period, pointed out to Delta the harmful effects of the amendments and urged it to change course, the company refused to negotiate.

Plaintiffs then filed the instant lawsuit, alleging causes of action for (a) breach of the implied covenant of good faith and fair dealing inherent in the Provider Agreement by Delta and (b) breach of fiduciary duty by the director defendants.[4] The trial court sustained demurrers by both Delta and the director defendants. As to the implied covenant claim, the court viewed Delta's demurrer as based *solely* on the 2018 settlement and concluded, without further analysis, it did not give Delta unfettered discretion to disregard statutory or common law. As to the breach of fiduciary duty claim, the court assumed without analysis that directors of Delta owe fiduciary duties to member dentists, but ruled plaintiffs had not pled facts overcoming what is known as the "business judgment rule" set forth in Corporations Code, section 7231, subdivision (a).

Plaintiffs eventually filed a second amended complaint, to which the trial court again sustained demurrers, this time without leave to amend. As to the implied covenant claim against Delta, the court ruled plaintiffs could not allege facts showing a breach because the Provider Agreement—read in light of *both* the 2018 settlement and statutory provisions regulating health plan-provider contracts (Health & Saf. Code, § 1375.7)—gives Delta the unilateral right to modify fee schedules, subject only to its contractually agreed-to obligation to give dentists 120 -days' notice of material changes and the dentists' right to terminate their Provider Agreements if they choose not to accept the fee change. As to the breach of fiduciary duty claim against the

---

[4] Plaintiffs also alleged causes of action for violation of the UCL and breach of Delta bylaws, as well as an associated cause of action for declaratory relief. They have not pursued these claims on appeal. Therefore, we do not consider them further.

7

directors, the court ruled they owe plaintiffs no fiduciary duty in connection with Delta's exercise of its own contractual rights under the Provider Agreement and associated documents.

## DISCUSSION[5]

### *Plaintiffs' Implied Covenant Claim Against Delta*

The parties agree the Provider Agreement, like every contract, includes an implied covenant of good faith and fair dealing. (*Carma Developers (Cal.), Inc. v. Marathon Development California Inc.* (1992) 2 Cal.4th 342, 371 (*Carma*).) What they disagree about is the scope of that covenant.

Plaintiffs maintain the implied covenant limits the language of the 2018 settlement agreement, the amended Provider Agreement, and amended Rules specifying, inter alia, that Delta has the "right to determine unilaterally the provisions of the [Provider Agreement], including without limitation any provisions relating to fee reimbursement." Delta asserts, in turn, the contractual language means what it says—that Delta can make unilateral changes to the Provider Agreement and associated documents provided it gives dentists 120 days' notice of the upcoming change, during

---

[5] Our standard of review of a judgment of dismissal following an order sustaining a demurrer without leave to amend is well established. We decide independently whether the facts alleged in the complaint suffice to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) To decide if a trial court abused its discretion in making its ruling without leave to amend, we assess "whether there is a reasonable possibility that the defect can be cured by amendment." (*Ibid.*) The burden of identifying new allegations that could cure a defect rests "squarely on the plaintiff." (*Ibid.*)

which time dentists may terminate their affiliation with Delta if they choose not to accept the amended terms for future services—and that these provisions cannot effectively be rewritten by invoking the implied covenant.

The parties, respectively, rely on two principles of implied-covenant law long acknowledged to be in tension—on the one hand, "that the covenant of good faith should be applied to restrict exercise of a discretionary power," and on the other, "that an implied covenant must never vary the express terms of [a contract]." (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 804 (*Third Story Music*), discussing *Carma*, *supra*, 2 Cal.4th at pp. 372–376.) Plaintiffs stress that the covenant has "particular application in situations where one party is invested with a discretionary power affecting the rights of another" (*Carma*, at p. 372), while Delta points out in "no reported case" has a court "held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement." (*Id.* at p. 374.)

In *Third Story Music,* the court, in a thoughtful opinion authored by Justice Epstein, reconciled these principles. And, as we shall explain, under that analysis the plain language of the contractual documents here must be given effect.

### *The Implied Covenant of Good Faith and Fair Dealing*

Every contract includes an implied covenant that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." (*Comunale v. Traders & General Insurance Co.* (1958) 50 Cal.2d 654, 658.) Courts infer such a covenant " 'to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' " (*Carma*, *supra*, 2 Cal.4th at p. 373; see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349 (*Guz*) [the implied covenant serves "merely to prevent one contracting party from

9

unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*"].)

Carma illustrates the conflict between the two aspects of the covenant. As *Third Story Music* explains, "In *Carma,* the parties had entered into a lease [stating] that if the tenant procured a potential sublessee and asked the landlord for consent to sublease, the landlord had the right to terminate the lease, . . . negotiat[e] with the prospective sublessee, and appropriate for itself all profits from the new arrangement. In [one] passage . . . , the court recognized that '[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.' ([*Carma, supra,*] 2 Cal.4th at 372.) The court [stated] that '[s]uch power must be exercised in good faith.' (*Ibid.*) [¶] At the same time, the *Carma* court upheld the right of the landlord to freely exercise its discretion to terminate the lease in order to claim for itself—and deprive the tenant of—all profit from the expected sublease. In this regard, the court stated: 'We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. [Citations.] "The general rule . . . is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be [inferred] which forbids such acts and conduct. . . . ." ' ([*Carma*], at p. 374. . . .)" (*Third Story Music*, *supra*, 41 Cal.App.4th at p. 803.)

10

*Third Story Music* applied these principles to "a dispute between a company which [had] owned the rights to [certain recordings] of singer/songwriter Tom Waits . . . and the party which purchased those rights [Warner]." (*Third Story Music, supra*, 41 Cal.App.4th at pp. 800–801.) The purchase agreement gave Warner the exclusive right to sell, license, or otherwise exploit the recordings. (*Id.* at p. 801.) It "specifically stated that Warner 'may at our election refrain from any or all of the foregoing.' " (*Ibid.*) It entitled Third Story Music (TSM), in turn, to a royalty on Warner's earnings from exploiting the music, and it required Warner to pay TSM a fixed sum "as an advance." (*Ibid.*) After paying that sum, Warner chose not to license certain works (upon Waits's refusal to give consent), and TSM sued for breach of the implied covenant. (*Id.* at pp. 801–802.) Warner demurred, claiming the contract term "permitting it to 'at [its] election refrain' from doing anything to profitably exploit the music . . . precludes application of any implied covenant." (*Id.* at p. 802.) TSM argued in opposition that "when a party to a contract is given this type of discretionary power, that power must be exercised in good faith," and letting Waits decide had entailed bad faith. (*Ibid.*)

The Court of Appeal framed the issue as follows: "When an agreement expressly gives to one party absolute discretion over whether or not to perform, when should the implied covenant of good faith and fair dealing be applied to limit its discretion?" (*Third Story Music, supra*, 41 Cal.App.4th at p. 802.) As the court observed, when a contract expressly confers "a discretionary power," there is "an apparent inconsistency" between the principles that the covenant "should be applied to restrict exercise of a discretionary power" yet "must never vary the express terms of the . . . agreement." (*Id.* at pp. 803–804.)

11

To reconcile these principles, *Third Story Music* reviewed "the authorities cited in *Carma* for the proposition that a discretionary power must be exercised in good faith." (*Third Story Music*, *supra*, 41 Cal.App.4th at p. 804.) We quote its summary at some length: "In *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913 [(*Perdue*)] . . . , a bank was given discretion to set nonsufficient fund (NSF) charges to be paid by the customer. [Plaintiffs argued] that since the charges were subject to the bank's sole discretion, the contract lacked mutuality and was, in fact, illusory. (See *Automatic Vending Co. v. Wisdom* (1960) 182 Cal.App.2d 354, 357 . . . [' "An agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable" '].) By its ruling that ' "[u]nder California law, an open term in a contract must be filled in by the party having discretion within the standard of good faith and fair dealing," ' the court . . . was able to impose an objective standard and save an otherwise illusory agreement. . . . [¶] The same resolution was reached in *Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474 . . . , where it was alleged that a contract permitting the buyer of sugar beets to set the price to be paid was illusory. The court [inferred] an obligation to set the price fairly in accordance with the covenant of good faith and fair dealing, thus protecting the enforceability of the agreement. (*Id.* at p. 484.) [¶] In the same vein, covenants to use 'good faith' or 'best efforts' to generate profits for [a] licensor are routinely [inferred] where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties, but the licensee does not expressly promise to do anything. . . . [¶] In each of these cases, the courts were forced to resolve contradictory expressions of intent . . . the intent to give one party total discretion over its performance and the intent to have a mutually binding

12

agreement.  In that situation, imposing the duty of good faith creates a binding contract where, despite the clear intent of the parties, one would not otherwise exist.  Faced with that choice, courts prefer to [infer] a covenant at odds with the express language of the contract . . . than [to] literally enforce a discretionary language clause and thereby render the agreement unenforceable. . . . "  (*Id.* at pp. 804–805, fn. omitted.)

"Does a different result ensue," the court then asked, if "the contract is unambiguous [and] otherwise supported by adequate consideration, and the implied covenant is not needed to effectuate the parties' expressed desire for a binding agreement?"  (*Third Story Music, supra,* 41 Cal.App.4th at p. 806.) The court answered this question in the affirmative, discussing three illustrative cases.  (*Ibid.*)

Most relevant here is *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263 (*Gerdlund*), in which a "sales representative agreement . . .  stated '[n]otice of termination may be given at any time and for any reason' on 30 days' notice," and the appellate court "reversed the trial court's use of the covenant of good faith to impose a requirement of cause for termination on the ground that '[n]o obligation can be [inferred] . . . which would result in the obliteration of a right expressly given under a written contract. . . .' [Citation.]  The 30-day notice requirement supplied sufficient consideration.  (See [citation] ['[. . .] [A] provision for termination by one or either party after notice for a fixed period is enforceable and does not render the contract illusory.'])"  (*Third Story Music, supra,* 41 Cal.App.4th at p. 807.)

In cases like *Gerdlund,* explained *Third Party Music,* a party "was expressly given a discretionary power but regardless of how such power was exercised, the agreement would have been supported by adequate consideration"—so there was no need "to impose an implied covenant to

13

create mutuality." (*Third Story Music*, *supra*, 41 Cal.App.4th at p. 808.) In short, courts "are not at liberty to [infer] a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement. In all other situations where the contract is unambiguous, the express language is to govern, and '[n]o obligation can be [inferred] . . . which would result in the obliteration of a right expressly given under a written contract.' " (*Ibid.,* quoting *Gerdlund, supra*, 190 Cal.App.3d at pp. 277–278.)

Applying this reading of the implied covenant law to the contract before it, *Third Party Music* acknowledged that, "[r]ead literally," the contract term entitling Warner " 'at its election' " to market the music or not "is a textbook example of an illusory promise." (*Third Story Music*, 41 Cal.App.4th at p. 808.) So if that were "the only consideration given by Warner, a promise to use good faith would necessarily be implied." (*Ibid.*) But that was not the only consideration Warner gave. It also "promised to pay TSM a guaranteed minimum amount no matter what efforts were undertaken." (*Ibid.*) Thus, regardless of Warner's discretion to market or refrain from marketing the music, the contract was "supported by consideration." (*Ibid.*) "As we see it," said the court, "Warner bargained for and obtained all rights to [the music] and paid legally adequate consideration. That it chose not to grant a license in a particular instance cannot be the basis for complaint . . . as long as [it] made the agreed minimum payments and paid royalties when it did exploit the work. 'The courts cannot make better agreements for parties than they themselves have been satisfied to enter into[,] or rewrite contracts because they operate harshly or inequitably.' " (*Id.* at pp. 808–809.)

14

***Pertinent Statutory Law***

With this understanding of the common law governing the implied covenant of good faith and fair dealing, we turn to pertinent provisions of the statutory law governing certain aspects of the parties' contractual relationship here.

Health care plans like Delta are "governed by the Knox–Keene Health Care Service Plan Act of 1975 (the Knox–Keene Act . . .). (Health & Saf. Code, § 1340 et seq.) The Knox-Keene Act 'is "a comprehensive system of licensing and regulation. . . ." ' " (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1004–1005.) The Health Care Providers' Bill of Rights (Health & Saf. Code, § 1375.7), added to the Knox–Keene Act in 2002, governs some procedural aspects of contracts between plans like Delta and providers like plaintiffs.

Plaintiffs concede, as the trial court put it, that "the statutory scheme expressly contemplates that [Delta] has the right to set and amend fees, and places no limitations on [its] discretion to do so." Their response is that this statutory scheme, and specifically Health and Safety Code section 1375.7, is "irrelevant" to their implied covenant claim. Delta, on the other hand, claims this statute flatly bars plaintiffs' claim. Neither characterization is wholly accurate.

As enacted, Health and Safety Code section 1375.7 had, and continues to have, two provisions of potential relevance: subdivisions (b)(1)(A) and (b)(1)(B). (Stats. 2002, ch. 925, § 1.)

Subdivision (b)(1)(A) of Health and Safety Code section 1375.7 provides in relevant part: "No contract . . . between a plan and a health care provider for the provision of health care services to a plan enrollee or subscriber" shall contain "[a]uthority for the plan to change a material term *of the contract*,

15

unless the change has first been negotiated and agreed to by the provider and the plan [or falls within an exception irrelevant here]." (Italics added.) This subdivision further provides: "If a change is made by amending *a manual, policy, or procedure document referenced in* the contract, the plan shall provide 45 business days' notice to the provider, and the provider has the right to negotiate and agree to the change. If the plan and the provider cannot agree to the change . . . , the provider has the right to terminate *the contract* prior to the implementation of the change." (*Ibid.*, italics added.) "In any event, the plan shall provide at least 45 business days' notice of its intent to change a material term. . . ." (*Ibid.*)

Subdivision (b)(1)(B) of Health and Safety Code section 1375.7 makes an exception to subdivision (b)(1)(A)'s mutual-agreement requirement for one type of health care plan—specifically, preferred provider arrangements. Subdivision (b)(1)(B) states: "If a contract between a provider and a plan provides benefits to enrollees or subscribers through a preferred provider arrangement, the contract may contain provisions permitting a material change *to the contract* by the plan if the plan provides at least 45 business days' notice to the provider of the change and the provider has the right to terminate the contract" before the change takes effect. (Health & Saf. Code, § 1375.7, subd. (b)(1)(B), italics added.) The parties do not dispute, and the trial court clearly concluded, the Provider Agreement at issue here falls within this subdivision.[6]

Ten years after the enactment of Health and Safety Code section 1375.7, subdivisions (b)(1)(A) and (b)(1)(B), the Legislature amended the statute to add a provision pertaining specifically to dentists. (Stats. 2012,

---

[6] Since the Rules are a part of the contract through incorporation by reference, this subdivision also applies to changes to them, as well.

16

ch. 447, § 1.) This amendment did not alter the existing provisions of the statute which apply to all plan-provider contracts, including those between dental plans and dental providers. Rather, the amendment added a new subdivision addressing an issue assertedly unique to dentists. According to the author, dentists often practice alone or in small groups and can be harmed by a lack of "current information on preauthorization timing, reimbursement rates, or claims processing." (Assem. Com. on Health Report, Assem. Bill No. 2252 (2011–2012 Reg. Sess.) as amend. Apr. 10, 2012, p. 2.)[7] The proposed legislation would therefore "require dental plans to provide contracting dentists notice of any changes to the plan's rules, regulations, guidelines, policies or procedures concerning contract, coverage, or payment for dental services." (*Ibid.*) The CDA, which sponsored the bill, similarly stated in support that "while existing law and regulations require the plans to notify contracted providers of certain changes, . . . gaps in these requirements . . . can cause disruption, confusion and frustration among providers." (*Id.* at p. 3.)

Thus, the statute was amended to add subdivision (c), which provides that if a plan makes "a material change . . . to [its] *rules, guidelines, policies, or procedures* concerning dental provider contracting or coverage of or payment for dental services, the plan shall provide at least 45 business days' written notice to the dentists contracting with [it]," with some exceptions not relevant here. (Health & Saf. Code, § 1375.7, subd. (c)(1).) A change is "material" if it affects "the system by which the plan adjudicates and pays claims for treatment" in a way "that would reasonably be expected to cause

---

[7] We take judicial notice of the legislative history of Health and Safety Code section 1375.7, as well as that of other statutory provisions we cite in this opinion, on our own motion in accordance with Evidence Code sections 452, subdivision (c), and 459.

17

delays or disruptions in processing claims" or determining eligibility, or if it affects "general coverage or general policies of the plan that affect rates and fees paid." (*Id.*, subd. (c)(2).)

As introduced, the legislation amending the statute was not limited to "material" changes and therefore would have subjected *any* change to a "plan's rules, regulations, guidelines, policies or procedures concerning contract, coverage, or payment for dental services" to the same notice and negotiation requirements set forth in Health and Safety Code section 1375.7, subdivision (b)(1)(A). (Assem. Bill No. 2252 (2011–2012 Reg. Sess.) § 1, as introduced Feb. 24, 2012.) After Delta and others opposed "dispens[ing] with the materiality requirement of current law" (Assem. Com. on Health Report, Assem. Bill No. 2252 (2011–2012 Reg. Sess.) as amend. Apr. 10, 2012, p. 3), the bill was amended to both add a materiality requirement and remove the negotiation requirement. (See Assem. Bill No. 2252 (2011–2012 Reg. Sess.), § 1, as amend. Apr. 23, 2012 [adding materiality requirement]; *id.*, § 1, as amend. May 25, 2012 [deleting negotiation requirement].)

Finally, Health and Safety Code section 1375.7 has, since its enactment, included a provision now set forth in subdivision (g) stating in pertinent part: "Nothing in this section shall be construed or applied as setting the rate of payment to be included in contracts between plans and health care providers." (Health & Saf. Code, § 1375.7, subd. (g).)

This history, in conjunction with the text of Health and Safety Code section 1375.7, subdivisions (b)(1)(B), (c), and (g), makes clear that the Legislature has chosen to allow dental plans to unilaterally make material changes to their *contracts* with dental providers who provide services through a preferred provider network. In other words, there is no requirement that such providers must agree to future changes to their contracts with the plan.

18

And while they have a right to notice, they have no right to negotiate over such changes but do have the right to walk away from the contract during the notice period. (*Id.*, subd. (b)(1)(B).) Dental plans are also allowed to unilaterally change plan *"rules, guidelines, policies, or procedures* concerning dental provider contracting, or coverage of[,] or payment for dental services." (*Id.,* subd. (c)(1), italics added.) As to these changes, dental providers have a right to notice, but no statutory right to negotiate or to walk away from their contract with a plan if unhappy with the changes.

As we have noted, Delta urges that this statutory scheme flatly bars an implied covenant claim like plaintiffs' that attempts to circumscribe a dental plan's discretion with respect to payment for dental services, characterizing *Guz, supra*, 24 Cal.4th 317, as holding that the implied covenant "cannot override statutory rights." This, however, overstates the Supreme Court's ruling.

Prior to *Guz*, our courts had long construed Labor Code section 2922, the statute at issue in that case, to mean that absent a contrary contract term, "at-will employment may be ended by either party 'at any time without cause,' for any or no reason." (*Guz, supra*, 24 Cal.4th at p. 335.) The high court agreed "the statutory presumption of at-will employment is strong," but also stated the parties, themselves, can "*agree*[] to any limitation, otherwise lawful, on the employer's termination rights." (*Id.* at pp. 335–336.) Guz, an at-will employee, advanced two theories as to why his employment could assertedly not be terminated without good cause. The first was an implied-in-*fact* theory based on company policies, which he failed to prove. (*Id.* at pp. 336–348.) The second was an implied covenant theory, which the high court held also failed because the statute "establishes the presumption that an employer may terminate its employees at will, for any or no reason" (*id.* at

19

p. 350); "limitations on these employer prerogatives are a matter of the parties' specific agreement, express or implied in fact" (*ibid.*); and the implied covenant cannot "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Ibid.*) The point was not that Labor Code section 2922 creates a "statutory right" (a phrase the court never used in discussing the implied covenant claim). Rather, the statute inserts, into every employment contract not specifying otherwise, an implied-in-law contract term authorizing termination at will, and the implied covenant of good faith can never limit or override a specific contract term, whether that term be express, implied in fact, or, as in *Guz*, implied in law. (See *Desny v. Wilder* (1956) 46 Cal.2d 715, 735–736 [types of contract terms].)

Health and Safety Code section 1375.7 is not like Labor Code section 2922 in the way Delta suggests. Health and Safety Code section 1375.7 merely *allows* a dental plan to include in its contract with providers an express term authorizing the plan to make unilateral changes to the material terms of the contract, as well as the terms of other plan documents, subject only to a notice requirement (Health & Saf. Code, § 1375.7, subds. (b)(1)(B), (c)(1)), as Delta has done. But Health and Safety Code section 1375.7 does not, itself, *insert* an implied-in-law term into a plan/provider contract in the way Labor Code section 2922 inserts an implied-in-law term authorizing termination at will into every employment contract not specifying otherwise. However, Health and Safety Code section 1375.7 is like Labor Code section 2922 in another relevant respect. Because Health and Safety Code section 1375.7 merely authorizes contract terms rather than itself inserting them, it does not foreclose the parties' ability to contractually "*agree*[] to any limitation, otherwise lawful" on a plan's right to modify its

20

contract with providers. (*Guz, supra,* 24 Cal.4th at p. 336.) We therefore turn to the pertinent contractual documents to determine whether the parties did so here.

### *The Contractual Documents*

As we have discussed, the Rules incorporated by reference in the Provider Agreement, as amended by the 2018 settlement, give Delta the "right to make amendments to [Provider Agreements], including these [Rules], and any other rules, policies, or procedures." (Underscoring omitted.) Such amendments are "binding upon Delta . . . participating dentists and effective 120 calendar days from the time Delta . . . mails . . . notice" thereof, unless a dentist "declines to be bound by the amendment(s)," in which case they "shall so advise Delta . . . and terminate [their Provider Agreement] within the . . . notice period." (Underscoring omitted.) The contracted fee is defined, in turn, as the fee for each procedure a dentist "has contractually agreed with Delta . . . to accept as payment in full for treating Enrollees based on the Enrollee's Plan (e.g., 'Premier Contracted Fee,' 'PPO Contracted Fee')," and "is subject to and cannot exceed a maximum amount allowed as determined by Delta . . . for the Enrollee's Plan [and the dentist's] network, specialty and location. . . ."

Two paragraphs of the Rules spell out how Delta will set and may alter contracted fees. The first—added by the 2018 settlement—states that "[i]n determining the maximum amounts allowed for Contracted Fees (e.g., Premier and PPO) . . . , Delta . . . may take into account, among other things, market and competitive conditions." (Underscoring omitted.) The other provides that if Delta reduces "maximum amounts allowed or levels or amounts of fee reimbursement generally applicable to Premier dentists," it will give "120 calendar days' notice" informing dentists of "(1) [their]

21

Contracted Fees affected by the reduction(s) and (2) the potential financial impact of the reduction(s) on [their] Contracted Fee reimbursements," given their recent billing. (Underscoring omitted.) "If the dentist does not wish to accept the new Premier Contracted Fees, the dentist shall so advise Delta . . . and terminate [their participant] agreement within the 120 calendar-day notice period." (Underscoring omitted.)

The 2018 settlement agreement, itself, states Delta "has the right to determine unilaterally the provisions of the [Provider Agreement] (including the Rules), including without limitation any provisions relating to fee reimbursement; levels or amounts of fee reimbursement; methods, procedures[,] or formulas for determining fee reimbursement; dispute resolution; and Delta['s] right to amend the [Provider Agreement] (including the Rules), provided that nothing contained herein shall be construed to constitute an agreement that Delta . . . may violate any statutory or common law right by future conduct."[8]

The parties' quarrel over whether Delta breached the implied covenant of good faith and fair dealing by not engaging in a more extensive review and analysis of contracted fees before making changes to the Provider Agreement and Rules is predicated on the dueling principles analyzed in *Third Story Music.* Plaintiffs assert the covenant "should be applied to restrict exercise of a discretionary power." (*Third Story Music, supra,* 41 Cal.App.4th at p. 804.)

---

[8] We note the settlement agreement did not require Delta to amend the Rules to include the text of the "unilateral right" provision, so as to make it part of the Provider Agreement through incorporation by reference. Nevertheless, the parties treat the provision as binding and relevant to the scope of the implied covenant in the Provider Agreement. We thus do the same.

Delta maintains the implied covenant can "never vary the express terms of the parties' agreement." (*Ibid*.)

As we have discussed, *Third Story Music* harmonized these principles by holding that if, as here, a contract expressly entitles a party to engage in discretionary conduct—e.g., to unilaterally make fee changes that will take effect after a 120-day notice period during which the other party may terminate the contract—the second principle, namely upholding the language of the contract as written, will prevail unless applying the first principle, namely using the covenant to restrict the exercise of discretion, is necessary to save the contract from being illusory.

And as in *Third Story Music,* there is no need to look to the discretionary constraints of the implied covenant in order to save the Provider Agreement from being illusory, as it is supported by consideration regardless of Delta's right to unilaterally make changes to the fee structure. Specifically, the consideration Delta gives—in exchange for dentists' promises to care for enrollees and accept the contracted fees as payment—consists of its promise to pay them at the stated rate as of the time the services are performed. Plaintiffs make no claim that a change to the fee structure results in providers being paid less for services they have *already* provided than they would have been paid prior to any change to the fee structure. Rather, any change in fees is prospective, pertaining only to dental services that may be provided in the future. Accordingly, plaintiffs receive what the parties agreed to at the time—that in exchange for the services they provide to plan enrollees, they will be paid the stated fee until 120 days after such time as Delta may notify them of a change in the fees, during which time they can choose to remain a Delta dentist subject to the modified fee structure or terminate the Provider Agreement.

23

The notice-and-right-to-terminate provisions distinguish this case from *Perdue, supra,* 38 Cal.3d 913, *Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128 (on which plaintiffs heavily rely), and *Automatic Vending Co. v. Wisdom* (1960) 182 Cal.App.2d 354—cited in *Third Story Music* as cases in which courts had to infer good faith limits on a party's discretion under a contract to set a fee it would charge or pay the other. (*Third Story Music*, *supra*, 41 Cal.App.4th at p. 804, citing *Perdue*, at p. 924; *Lazar*, at p. 141; see *Automatic Vending*, at pp. 357–358.) In *Perdue*, a bank's contracts with account holders gave it unfettered discretion to set the NSF fee customers had to pay for bounced checks (*Perdue*, at pp. 923–924); in *Lazar*, rental-car contracts gave Hertz unfettered discretion to set the rate it would charge customers for gas to refill the tanks of returned cars (*Lazar*, at p. 141); and in *Automatic Vending*, a company's contract to pay a cafe owner a commission on cigarette sales from a vending machine placed in her cafe gave the company unfettered discretion to change the commission rate during the contract's fixed term—with no duty to give notice of an impending change and let the owner terminate the contract before the change would take effect. (*Automatic Vending*, at pp. 355–357.) Each contract thus entitled the defendant to set or change the fee it would charge or pay *after* the plaintiff had done something obligating them either to pay, or to accept payment from, the defendant—e.g., writing an NSF check, returning a car with a less-than-full tank, or devoting space to a vending machine. In other words, the plaintiffs *never* received the bargain to which they had agreed.

Not so here. When Delta announced the impending fee changes, plaintiffs were entitled to be paid—and do not allege that they were not in fact paid—for services they had performed up to and until the expiration of the 120-day notice period under the fee structure in effect when they entered

24

their Provider Agreements. The changes Delta subsequently made affected only the fees plaintiffs would receive for *future* services if, after the notice period, they chose to remain a party to the contract and provide such services. Plaintiffs cite no authority, and we are aware of none, suggesting that in such circumstances, the implied covenant can be used to constrain a party's unilateral discretion to make changes to a rate structure for future services.[9]

Plaintiffs rely most heavily on *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354 (*Locke*), which recited the " ' "discretionary power" ' " principles at issue in *Third Story Music* but did not in fact apply them. (*Id.* at p. 363.) *Locke* arose from a dispute between actor/directors Sondra Locke and Clint Eastwood. (*Id.* at pp. 357–358.) After they broke up as a couple and she sued him, he secured "a development deal for Locke with Warner [Brothers (Warner)] in exchange for Locke's dropping her case against him."

---

[9] While plaintiffs argue Delta's market power makes it financially untenable to exercise their right to exit an agreement in response to a fee change, they have not challenged the orders sustaining demurrers to their cause of action under the UCL—a law meant to curb abuses of market power. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179–181, 186–187). Nor have they ever pursued an antitrust claim. In short, they identify no exception to the rule that courts cannot " 'rewrite contracts because they operate harshly or inequitably' " (*Third Story Music, supra*, 41 Cal.App.4th at pp. 808–809.) Moreover, as statutes like the UCL and antitrust laws show, setting public policy to regulate market power is the province of the Legislature, not of the courts applying the implied covenant. (See *Carma, supra*, 2 Cal.4th at p. 373 [courts infer covenant of good faith " 'to protect the express covenants or promises of the contract, not . . . some general public policy interest not directly tied to the contract's purpose' "]; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 693–697, 700 [whether to expand tort remedies for breach of implied covenant of good faith from insurance to employment context is matter for Legislature].)

(*Id.* at p. 358.)  Warner was to pay Locke $250,000 per year for three years for "a 'non-exclusive first look deal' " requiring her to offer to Warner any film she wished to develop, and giving Warner 30 days to approve or reject it. (*Ibid.*)  After Warner paid the required sums but did not develop any of the films Locke proposed, she sued Warner, claiming that the deal "was a sham," Warner never meant to make a film with her, and its sole motive in entering the deal was to help Eastwood.  (*Id.* at pp. 358–359.)  To oppose summary judgment, she offered evidence Warner executives had told third persons they would never make a movie with her.  (*Id.* at p. 360.)

The Second District, in reversing a summary judgment as to Locke's claim for breach of the implied covenant, applied not the "discretionary power" principles analyzed in *Third Story Music* but a different principle— one that governs contracts in which "it is a condition of an obligor's duty that he or she be subjectively satisfied with respect to the obligee's performance." (*Locke, supra,* 57 Cal.App.4th at p. 363.)  In such cases, to determine if the condition was satisfied, courts apply "the subjective standard of *honest satisfaction.*"  (*Ibid.*)  Thus, *Locke* recited:  " 'Where the contract involves matters of fancy, taste or judgment, the promisor is the sole judge of his satisfaction.  If he asserts *in good faith* that he is not satisfied, there can be no inquiry into the reasonableness of his attitude.  [Citations.] [¶] Traditional examples are employment contracts . . .  and agreements to paint a portrait, write a literary or scientific article, or produce a play or vaudeville act.  [Citations.]'  [Citations.]  In such cases, 'the promisor's determination that he is not satisfied, *when made in good faith,* has been held to be a defense to an action on the contract.' "  (*Id.* at pp. 363–364.) Applying *that* rule, the court concluded, "If Warner acted in bad faith by categorically rejecting Locke's work and refusing to work with her,

26

irrespective of the merits of her proposals, such conduct is not beyond the reach of the law." (*Id.* at p. 364.) The court then distinguished *Third Story Music*, stating that the contract "did not give Warner the *express right* to refrain from working with Locke" but instead gave it "discretion with respect to developing Locke's projects," which the implied covenant "obligated Warner to exercise . . . honestly and in good faith." (*Id.* at p. 367, italics added.)

We have no quarrel with *Locke's* application of the "honest satisfaction" principle, but it is irrelevant here. That principle governs binary determinations: whether a condition precedent to a party's duty to perform under a specific covenant of a contract was or was not met, which turns on whether the party was or was not honestly satisfied with the other party's performance. In *Locke*, the condition was whether Warner was subjectively satisfied that a proposed project had commercial and aesthetic merit.

The case at hand involves no such issue. Plaintiffs do not contend they rendered a performance that triggered a duty on the part of Delta, if it was honestly satisfied with their performance, and that Delta dishonestly claimed dissatisfaction to avoid performing, as Warner allegedly did by dishonestly claiming dissatisfaction with Locke's proposed movies. Rather, this case falls squarely within the principles addressed and reconciled in *Third Story Music*.

Pointing to the final proviso of the 2018 settlement agreement—that the settlement shall not " 'be construed to constitute an agreement that Delta . . . may violate any statutory or common law right by future conduct' " (italics omitted)—plaintiffs also argue the parties implicitly agreed that the implied covenant of good faith and fair dealing—as part of the "common law"—would substantively limit Delta's express " 'right to determine unilaterally the provisions of the [Provider Agreement] (including the Rules).' " As the trial

27

court observed, this argument is "fatally circular." More precisely, the relied-on proviso triggers the exact question we have addressed—*what is the scope* of this "common-law" implied covenant and does it impose limits on Delta's otherwise unilateral right to change future payment rates? Thus, the proviso, itself, does nothing to advance plaintiffs' implied covenant claim.

In sum, we conclude the thorough and sensible analysis of *Third Story Music, supra*, 41 Cal.App.4th at pages 808–809, dictates that plaintiffs cannot invoke the implied covenant of good faith and fair dealing to impose substantive constraints and additional procedural requirements on Delta's unilateral right under the Provider Agreement and associated documents to make future changes to its fee structure.[10]

### Plaintiffs' Breach of Fiduciary Duty Claim Against Delta Directors

We next consider whether plaintiffs can proceed with a breach of fiduciary duty claim against Delta directors to effectively secure the constraints on Delta's discretion they cannot achieve through a breach of the

---

[10] Plaintiffs maintain they should have been allowed to amend to add an allegation that "CDA drafted the proviso with the express intent of preserving the duty of good faith and fair dealing and disclosed that intent to Delta . . . during lengthy negotiations." But no one disputes Delta owes plaintiffs that duty; the incurable defect in their cause of action is that the duty cannot override the contract's express terms in the way plaintiffs wish. Relatedly, plaintiffs cite *Moore v. Wells Fargo Bank, N.A.* (2019) 39 Cal.App.5th 280, for the proposition that "[w]hether the defendant has deprived the plaintiff of the benefit of his or her bargain, and the interpretation of ambiguous contract terms, are questions for the trier of fact." (See *id.* at p. 300.) But plaintiffs have neither identified a patent ambiguity in the terms of the contractual documents, nor proposed to allege facts extrinsic to those terms giving rise to a latent ambiguity, that require assessment by a trier of fact. (See *id.* at pp. 287–288 [discussing types of ambiguity].) Indeed, there is no dispute as to what the express terms of the contract provide; the only question is whether they can be constrained through an implied covenant claim.

implied covenant claim directly against Delta. We conclude the answer is, "no."

As we have recited, Delta is a nonprofit mutual benefit corporation and, as such, its corporate operating structure, including the duties of its officers and directors, is governed by the Nonprofit Corporation Law (Corp. Code, § 5000 et seq.). Enacted in 1978, the Nonprofit Corporation Law establishes the basic corporate law applicable to all legally cognizable nonprofit corporations.[11] (*Id., § 7110 et seq.*) It is separate and distinct from the corporate law governing for-profit corporations which is set forth in what is referred to as the General Corporations Law (*id., § 100 et seq.*) (GCL).

As pertinent here, the portion of the Nonprofit Corporation Law governing mutual benefit corporations (Corp. Code, § 7110 et seq.) provides that a director is to perform his/her/their duties "in a manner such director believes to be in the best interests of *the corporation* and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use."[12] (*Id.*, § 7231, subd. (a), italics added.) The GCL is different and provides that a director of a for-profit corporation is to perform their duties "in a manner such director believes to be in the best interests of *the corporation and its shareholders* and with such care, including reasonable

---

[11] These include public benefit corporations (Corp. Code, § 5110 et seq.) and religious corporations (*id., § 9110 et seq.*). (Stats.1978, ch. 567, § 7; see generally Assem. Select Com. on Revision of Nonprofit Corp. Code, Summary of Assem. Bill No. 2180 (1977–1978 Reg. Sess.) & Assem. Bill No. 2181 (1977–1978 Reg. Sess.) Apr. 21, 1978, p. 3 (hereafter Staff Rpt.).)

[12] The Nonprofit Corporations Law provisions setting forth the fiduciary duty of directors of public benefit corporations and of nonprofit religious corporations state the same. (Corp. Code*, §§ 5231*, subd. (a) [public benefit corporation], 9241, subd. (a) [religious corporation].)

inquiry, as an ordinarily prudent person in a like position would use." (*Id.*, § 309, italics added.)

The principles of statutory construction, of course, instruct that a statute should be read according to its plain language where its meaning is clear. (*Pacific Fertility Cases* (2022) 78 Cal.App.5th 568, 576 [" '[t]he statute's plain meaning controls . . . unless its words are ambiguous,' " quoting *Green v. State of California* (2007) 42 Cal.4th 254, 260, review granted Aug. 17, 2022, S275134.]) They likewise instruct that where the Legislature has employed a phrase in one statute, but not in another statute involving the same subject matter, the courts are not free to read into the latter statute language the Legislature could have included, but did not. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [" 'when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded' "].) Under these principles, there would appear to be no doubt that Corporations Code section 7231 should be applied in accordance with its plain language—i.e., that directors of a nonprofit mutual benefit corporation owe a fiduciary benefit to discharge their duties "in a manner such director believes to be in the best interests *of the corporation.*" (Corp. Code, § 7231, subd. (a), italics added.) It is also of note that members are empowered to bring derivative actions on behalf of the nonprofit corporation, ensuring that fiduciary duties owed *to the corporation* can be enforced. (*Id.*, § 7710.)

But even if Corporations Code section 7231 were arguably ambiguous, the legislative history of the Nonprofit Corporation Law makes clear the difference between the Nonprofit Corporation Law and the GLC fiduciary duty statutes has significance. (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 116 [though "plain language of the statute is clear, an

30

examination of [its] legislative history confirms" the legislative intent the language suggests].)

The drafters of the Nonprofit Corporation Law—an Assembly Select Committee working with a State Bar Committee, led by a law school professor—clearly stated the new nonprofit law was crafted with the intent it would employ the language of the then-recently enacted GCL (which several members of the Select Committee had also helped draft (Staff Rpt., *supra*, at p. 2) *except* where the new nonprofit law *differed* from the GLC. (*Ibid.* ["sections employ the GCL language whenever the same substantive results are intended"].) Thus, the drafters' decision not to carry over into the Nonprofit Corporation Law the same fiduciary duty owed by directors of for-profit corporations under the GLC must be understood as both intentional and of substantive import.

This difference in the Nonprofit Corporation Law and the GLC also makes sense. Members of nonprofit mutual benefit corporations, unlike shareholders of for-profit corporations, generally cannot receive gains, profits, or dividends except on the nonprofit corporation's dissolution (Corp. Code, §§ 7411–7414), making their proprietary interest in the nonprofit often "more theoretical than real." (Staff Rpt., *supra*, at p. 3.) Thus, there is a significant difference in the degree of alignment of the interests of members and the interests of the nonprofit corporation, and the degree of alignment of the interests of shareholders, who are economically invested in the financial performance of the for-profit corporation, and the interests of the for-profit corporation.

Plaintiffs argue the reason Corporations Code section 7231, subdivision (a) requires directors of mutual benefit corporations to perform their duties only "in the best interests of the corporation," and not also in the

31

best interests of "its shareholders" as required by the GCL, is that mutual benefit corporations have no shareholders, only members and, even then, are not required to have members. (Corp. Code, § 7310.) However, this overlooks the process by which the Nonprofit Corporation Law was crafted.

The drafters of Corporations Code section 7231 began with a template, namely the fiduciary duty section of the GCL, which creates a duty to both the "corporation and its shareholders." (Corp. Code, § 309, subd. (a).) Had the drafters meant to impose on directors of nonprofit corporations the same substantive duty imposed on directors of for-profit corporations, they would have used comparable terminology, e.g. that a director of a mutual benefit corporation shall perform their duties "in a manner such director believes to be in the best interests of the corporation *and members thereof*." Such language would not only have imposed the same substantive fiduciary duty on directors of nonprofit corporations and for-profit corporations, it would also be suitable whether a nonprofit corporation has members or not.

In short, no legislative history supports plaintiffs' speculation that, despite having stated the Nonprofit Corporation Law would use the language of the GCL *except* where the new nonprofit law differed and despite having intended—according to plaintiffs—that the new law's fiduciary duty provision would extend to members just as the GCL's fiduciary duty provision extends to shareholders, the drafters of the Nonprofit Corporation Law *sub silentio* took account of the fact some mutual benefit corporations might not have members and therefore made the fiduciary duty statute *completely* silent as to members. We simply cannot credit the Select Committee and State Bar Committee with such prolix reasoning destined to lead to the confusion and ambiguity the drafters took pains to avoid. (Staff Rpt., *supra*, at p. 3.)

In a second argument, unconnected to the text and history of Corporations Code section 7231, plaintiffs rely on *Coley v. Eskaton* (2020) 51 Cal.App.5th 943 (*Coley*), wherein the court stated "the directors of a nonprofit mutual benefit corporation, like the Association here, are fiduciaries who must act for the benefit of the corporation and its members." (*Id.* at p. 958.) However, the parties and court appear to have simply assumed such a fiduciary duty, the court stating: "First, *as all parties accept*, [the directors] owed a fiduciary duty to [the members]." (*Ibid.*, italics added.) This was followed, without discussion, by a citation to two cases, *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 514 (*Frances T.*) and *Cohen v. S & S Construction Co.* (1983) 151 Cal.App.3d 941, 945 (*Cohen II*).) (*Coley*, at p. 958.)

But rather than supporting plaintiffs' breach of fiduciary claim here, *Frances T.*, *supra*, 42 Cal.3d 490, undercuts it. The issue in *Frances T.* was whether the defendant homeowners' association, a mutual benefit corporation, and its directors could be "liable for injuries to a unit owner caused by third-party criminal conduct." (*Id.* at p. 495; *id.* at p. 525 (conc. & dis. opn. of Mosk, J.).) During a crime wave, homeowners had complained of poor lighting, and after Frances T.'s unit was burgled, she complained to the association's governing board. (*Id.* at pp. 496–497.) But the association did nothing. So she installed her own lighting—which the board ordered her to remove, as it violated the development's covenants, conditions, and restrictions (CC&Rs). (*Id.* at pp. 497–498.) She was then robbed and raped in her unit, and thereafter sued the association and its directors for negligence and breach of fiduciary duty. (*Id.* at pp. 498, 503, 513.)

With respect to Frances T.'s tort claim against the directors, our Supreme Court held it came within an exception to the general rule that

directors are not personally liable for a corporation's torts. (*Frances T.*, *supra*, 42 Cal.3d at pp. 503–507.) In so holding, the court rejected the directors' assertion that their "liability to *third persons* is controlled by the statutory duty of care [they] owe[] *to the corporation*, a standard defined in Corporations Code section 7231. This statutory standard of care, [known] as the 'business judgment rule,' applies to parties (particularly shareholders and creditors) to whom the directors owe a fiduciary obligation." (*Id.* at p. 507.) Thus, for purposes of her tort claim, the Supreme Court treated Frances T. as a "*third person*[]," and *not* as a member of the mutual benefit corporation, in analyzing the directors' "duty of care . . . *to the corporation*" under Corporations Code section 7231. (*Frances T.,* at p. 507, italics added.) This meant, in turn, that the statute's standard of care, i.e., the business judgment rule, could not shield the directors from tort liability. (*Ibid*.)

As for Frances T.'s fiduciary duty claim, the high court recited that, "Directors of nonprofit corporations such as the Association are fiduciaries . . . required to exercise their powers *in accordance with . . . the Corporations Code*." (*Frances T.*, *supra*, 42 Cal.3d at p. 513, italics added.) The court added, this fiduciary relationship "is governed by the statutory standard that requires directors to exercise due care and undivided loyalty for the interests *of the corporation*." (*Ibid.,* citing, inter alia, Corp. Code, § 7231, subd. (a), italics added.) The court went on to state that the association and the homeowners "also stand in a *common law* relationship, similar to that of landlord and tenant, that requires the landlord to exercise reasonable care in protecting tenants from criminal activity." (*Frances T.*, at p. 513, italics added.) Thus, said the high court, Frances T. "had a dual relationship with defendants." (*Ibid.*)

34

This dual relationship—as a corporate member and as a party to a "common law" relationship (similar to a landlord-tenant relationship)—rendered Frances T.'s reliance on another homeowner's association breach of fiduciary duty case, *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783 (*Raven's Cove*), "misplaced." (*Frances T.*, *supra*, 42 Cal.3d at p. 513.)

In *Raven's Cove,* explained the Supreme Court, "the homeowners acted as shareholders when they sued the developers, as directors, for [a] breach of fiduciary duty that resulted in damage *to the corporation.*" (*Frances T.*, *supra*, 42 Cal.3d at p. 513, italics added.) In other words, the homeowners brought an action on behalf of the association (and, thus, effectively pursued a derivative claim). Frances T., by contrast, said the court, "alleged that the Association, as a landlord, breached its duty to her as a tenant rather than as a shareholder [*sic*]."[13] (*Id.* at p. 514.) "Indeed, the defendants fulfilled their duty to plaintiff *as a shareholder* [*sic*] by strictly enforcing the provision in the CC&Rs [barring] alteration of the common areas. . . . The directors had no *fiduciary duty* to exercise their discretion one way or the other [as] to plaintiff's lighting so long as their conduct conformed to the standard set out in [Corporations Code] section 7231."[14] (*Frances T.,* at p. 514.)

---

[13] Because the homeowners' association was a nonprofit mutual benefit corporation, Frances T. was actually a "member," not a "shareholder." However, that the high court interchangeably used the terms and referred to Frances T. as a "shareholder" reinforces the significance of the fact that, in contrast to the fiduciary duty owed by directors of for-profit corporations under the GCL—to "the corporation and its shareholders"—the fiduciary duty owed by directors under the Nonprofit Corporation Law is owed only to the nonprofit "corporation."

[14] Justice Mosk—who would have held that Corporations Code section 7231, alone, governed the directors' potential *personal* liability—noted their duties are "established in Corporations Code section 7231" and under

35

Thus, *Frances T.* does not support *Coley's* unexamined assumption that the fiduciary duty owed by directors of nonprofit mutual benefit corporations is coextensive with that owed by directors of for-profit corporations and thus extends beyond the plain language of the Nonprofit Mutual Benefit Corporation Law to include not only the mutual benefit corporation, but also its members. To the contrary, the high court first referred to Frances T. as a "third person" in analyzing whether the directors were liable in tort for the acts *of the corporation.* It later referred to her as a "shareholder" entitled to enforce the directors' duty *to the corporation.* But, as the court explained, that was not what Frances T. was seeking to do. Rather, her claim arose from an individual, "common law" relationship (akin to a landlord-tenant relationship) with the corporation, and as to that relationship, she was owed no fiduciary duty. Thus, the high court never suggested the directors owed *her* a fiduciary duty in connection with her common law relationship with the association. (*Frances T., supra,* 42 Cal.3d at pp. 513–514.) Moreover, as the context of the court's discussion makes clear, when the court referred to members enforcing a director's fiduciary duty, it meant seeking redress for harm *to the corporation* from a breach of the fiduciary duty owed *to the corporation.* (*Id.* at p. 513 [*Raven's Cove* plaintiffs "acted as shareholders when they sued the developers, as directors, for [a] breach of fiduciary duty that resulted in damage *to the corporation,*" italics added].)

Like Frances T., each plaintiff here has a "dual relationship" with Delta—as a member of the mutual benefit corporation, and as an individual with a "common law" contractual relationship with the corporation. Just as

_____

that "*statute the directors apparently owe a duty to the corporation alone.*" (*Frances T., supra,* 42 Cal.3d at p. 525 (conc & dis. opn. of Mosk, J.), italics added.)

the directors of the homeowners' association owed Frances T. no fiduciary duty in connection with her "common law" relationship with the association (akin to a landlord/tenant relationship), so too, Delta's directors owe plaintiffs no fiduciary duty in connection with their "common law" contractual relationship with Delta.

*Cohen II, supra,* 151 Cal.App.3d 941, the other case cited by *Coley,* does not detract from the conclusion flowing from the Supreme Court's more recent—and binding—decision in *Frances T. Cohen II* is the third of a trilogy of cases, including *Raven's Cove,* discussing duties owed by homeowners' associations and their directors. (*Cohen II*, at p. 945; *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 (*Cohen I*); *Raven's Cove*, *supra*, 114 Cal.App.3d 783.) We begin with a review of the earlier cases, turning first to *Raven's Cove,* which the Supreme Court explained did *not* support Frances T.'s breach of fiduciary duty claim and, by parity of reasoning, does not support plaintiffs' breach of fiduciary duty claim here.

In *Raven's Cove*, a homeowners' association sued a developer and his employees for breach of fiduciary duty (i.e., for breach of a duty owed *to the association*). (*Raven's Cove*, *supra*, 114 Cal.App.3d at pp. 797–798.) The defendants, serving as the association's initial directors while units were being sold, failed to fund a reserve account for foreseeable expenses. (*Ibid.*) The appellate court noted, but did not apply, the Nonprofit Corporation Law, which had taken effect after the judgment. (*Id.* at p. 799, fn. 11.) Rather, citing a former statute that had made the GCL applicable to nonprofit corporations, the court stated the plaintiffs' claim was thus governed by former GCL section 820, which had required directors "to 'exercise their

37

powers in good faith, and with a view to the interests *of the corporation.*' " [15] (*Raven's Cove*, at p. 799, italics added.)  Accordingly, the court pronounced it "well settled that directors of nonprofit corporations are fiduciaries."  (*Ibid.*)

Given the conflict of interest that exists when a developer's affiliates "are also directors of the Association in its infancy," such persons cannot, said the court, "make decisions for the Association that benefit their own interests at the expense of the association and its members."  (*Raven's Cove, supra,* 114 Cal.App.3d at p. 799.)  In this regard, the court relied heavily on a law review article stating homeowners' association directors " 'are held to a high standard of conduct, the breach of which may subject each or all of them to individual liability,' " adding that if a developer " 'totally dominates the association, or . . . methods of control by the membership are weak or nonexistent, "closer judicial scrutiny may be felt appropriate," and the principles of fiduciary duty established [for] business corporations' " may apply.  (*Id.* at p. 800, quoting Hyatt & Rhoads, *Concepts of Liability in the Development and Administration of Condominium and Homeowners' Associations* (1976) 12 Wake Forest L.Rev. 915, 923 (Hyatt & Rhoads).)  The court then stated directors have "a fiduciary relationship to the homeowner members analogous to that of a corporate promoter to the shareholders," yet of "greater magnitude," since homeowners must join the association (*Raven's Cove,* at p. 800)—a gratuitous statement wholly unnecessary to the case before it, since, as the Supreme Court later pointed out in *Frances T.*, the case was brought by a homeowner's association for damages *it* sustained.

---

[15]  When the GCL was redrafted in 1977, the fiduciary duty owed by directors of for-profit corporations was expanded to require them to act "in the best interests of the corporation *and its shareholders*."  (Corp. Code, § 309, subd. (a), italics added.)

*Cohen I* and *Cohen II* followed two years later.  (*Cohen II*, *supra*, 151 Cal.App.3d at p. 945; *Cohen I*, *supra*, 142 Cal.App.3d at p. 650.)  *Cohen I* arose out of a homeowners' association's approval of a fence that would block the viewshed of Cohen, a homeowner and association member.  Cohen sued the association (but not its directors), asserting the association had violated the CC&Rs.  (*Cohen I*, at pp. 645–646.)  The appellate court stated it was a "settled rule" that homeowners' associations "must exercise their authority to approve or disapprove [a] homeowner's construction or improvement plans in conformity with the [CC&Rs] and in good faith."  (*Id.* at p. 650.)  Citing *Raven's Cove* and relying on the same law review article cited therein about homeowners' associations' "increasingly 'quasi-governmental' nature" (*Cohen I*, at p. 651, quoting Hyatt & Rhodes, *supra*, 12 Wake Forest L. Rev. at pp. 915, 918), the *Cohen I* court stated they "owe a fiduciary duty to their members."  (*Cohen I*, at p. 651.)  The court never mentioned the Nonprofit Corporation Law, let alone suggested any such duty arose therefrom.

*Cohen II* was a parallel suit against the developer that had controlled the homeowners' association's board and the committee that approved the fence.  (*Cohen II*, *supra*, 151 Cal.App.3d at pp. 943–944.)  This time, the court concluded the developer, like the association, owed homeowners a fiduciary duty—but not based on the association's status as a nonprofit corporation.  (*Id.* at p. 945.)  Indeed, in rejecting the developer's reliance on exculpatory clauses in the CC&Rs, the court pointed out it had drafted and taken "responsibility for . . . enforcement" of the CC&Rs by "controlling both the Association's board of directors and [its] procedures for approval of . . . plans."  (*Ibid.*)  "*It is of no moment,*" said the court, "*that the Association, a nonprofit corporation, is a separate legal entity.*"  (*Ibid.,* italics added.)  In light of the authority the CC&Rs gave the developer over homeowners' activities, *public*

39

*policy* barred its invocation of the exculpatory clause. (*Ibid.*) Then, citing *Raven's Cove*, the court deemed it "well settled" that a developer can be liable "to a homeowner's association for breach of the basic fiduciary duty to act in good faith, exercise proper management, and avoid conflicts of interest." (*Ibid.*) It added, "This fiduciary duty extends to individual homeowners, not just the homeowner's association." (*Ibid.*) The court, again, made no mention of Corporations Code section 7231 or any other provision of the Nonprofit Corporation Law. Rather, its analysis rested wholly on the fact the entity was a homeowner's association. (*Cohen II*, at p. 945.)

We are not concerned here with the duty courts have imposed on homeowner's associations based *solely* on their unique status as such and *outside* of the Nonprofit Corporation Law. Moreover, in *Frances T.*, our Supreme Court, expressly referencing the Nonprofit Corporation Law pertaining to mutual benefit corporations, held the directors of a homeowner's association owed the plaintiff member no fiduciary duty in connection with her "common law" relationship with the association. Accordingly, no matter what "fiduciary" duty directors of a homeowner's association may otherwise owe under the *Raven's Cove/Cohen* line of cases, under *Frances T.,* the directors of a nonprofit mutual benefit corporation, like Delta, owe no duty to members in connection with the members' separate "common law" relationship with the corporation, such as the contractual relationship plaintiffs have here with Delta.

Indeed, this is the only reasonable conclusion. Where, as here, a mutual benefit corporation contracts with its members as independent contractors, it would be impossible for directors guiding the corporation's conduct under such contracts to simultaneously fulfill fiduciary duties to the nonprofit corporation *and* to the contracting members. The trial court did not

40

err in holding the law does not put directors of nonprofit mutual benefit corporations in so patently untenable a position.

## DISPOSITION

The judgment is affirmed.  Defendants to recover costs on appeal.

                                        _____
                                        Banke, Acting P. J.


We concur:


_____
Langhorne Wilson, J.


_____
Smiley, J.


A170821, Calif. Dental Assoc. et al., v. Delta Dental

42

Trial Court: San Francisco City and County Superior Court

Trial Judge: Hon. Ethan P. Schulman

Counsel:

Keker, Van Nest & Peters LLP, Daniel E. Jackson, Brook Dooley, Travis S. Silva, Ryan James Hayward and Daniel T. Nguyen, for Plaintiff and Appellant.

Dechert LLP, Howard mark Ullman, Russell Paul Cohen, Joseph David Trujillo, Christopher McKeon, Miachel S. Pullos and John J. Hamill for Defendant and Respondent.